**STATE of Missouri, Respondent,**

**v.**

**Leonard NIEHOFF, Appellant.**

**No. 51084.**

Supreme Court of Missouri,

Division No. 1.

Nov. 8, 1965.

Norman H. Anderson, Atty. Gen., Jefferson City, F. Daley Abels, Special Asst. Atty. Gen., St. Louis, for respondent.

O'Hanlon & Daly, Robert J. O'Hanlon, Richard L. Daly, St. Louis, for appellant.

HOLMAN, Judge.

The defendant, Leonard Niehoff, was charged with stealing property having a value of at least $50, to wit, "Fourteen Thousand One Hundred Dollars," from Verna Lenau. The offense alleged was of the type which would have been classified as embezzlement prior to the enactment of our revised stealing statutes in 1955. See Sections 560.156 and 560.161, RSMo 1959, V.A.M.S. The jury returned a verdict of guilty and fixed defendant's punishment at imprisonment in the penitentiary for a term of ten years. Defendant has appealed from the ensuing judgment.

The evidence adduced will support the following statement of facts: In 1954 defendant and Henry Mohr incorporated the Reliance Real Estate Company. During the time in question Mr. Mohr was vice president and secretary of the corporation and owned 30% of the stock. Defendant was president and it may be inferred that he owned substantially all of the remainder of the stock. The company maintained two offices in the City of St. Louis with Mohr in charge of what was called the North Office and defendant in charge of the South Office. The principal business of the corporation was the sale of real estate for customers on a commission basis. In addition to eight office employees, Reliance had approximately fifty salesmen, many of whom were paid a stated sum every two weeks upon a drawing account. As a general rule Reliance closed from 30 to 35 sales each month involving properties having a total value of approximately $350,000.

In the fall of 1963 Angelo and Irene Branca listed their home for sale with Reliance. Miss Verna Lenau, a manicurist at the Park Plaza Hotel, desired to buy a home and upon seeing the Branca property advertised contacted Miss Wanersten, an agent of Reliance, concerning same. After looking at the house, Verna agreed to purchase it for $15,000. The parties signed a sales contract and Verna delivered an earnest money check for $900 to Reliance. Verna went to the office of Reliance on December 5, 1963, for the purpose of closing the transaction and there dealt with defendant. She gave him a cashier's check payable to Reliance for $14,100. She stated that she wanted to obtain title insurance and a home owners' insurance policy and paid defendant an additional sum of $256 to cover the cost of the insurance and other items. Defendant told her that the insurance could not be obtained for a few days and that the closing of the transaction would thus be delayed. After a few days Verna apparently became disturbed about the situation. She thereafter telephoned defendant each day for the next fourteen days, but was unable to obtain a deed to the property she had purchased. She employed an attorney who contacted defendant and they agreed upon a meeting at 1 o'clock p. m. on January 10, 1964, at the Missouri Title Company for the purpose of closing the transaction. Verna, her attorneys, and the Brancas were present at that time and place but defendant did not appear and the transaction was not closed. Verna's money was never returned to her and she did not receive title to the property.

In early January 1964 Reliance received some unfavorable publicity and its offices were closed about January 8. A receiver was appointed on February 10, 1964. There was considerable evidence indicating that Reliance was in bad financial condition during 1963 and that defendant resorted to desperate measures in order to keep the company operating. Reliance had a trust account in the North Side Bank which was used solely by the North Office. All transactions were closed in the South Office and at the time of the closing the earnest money payment in the North Office trust account was transferred to the South Office. The main bank account of Reliance was in the Clayton Bank. Substantially all receipts of the corporation were deposited in that account, and all expenses were paid therefrom until the account was closed by the bank in the latter part of 1963. All disbursements from the account were approved by defendant. At the time defendant deposited Verna's check for $14,100 in the Reliance bank account, the account, according to the checkbook, was overdrawn to the extent of $8,282, and defendant knew of that situation. It was not at all unusual for the Reliance bank account to be overdrawn.

Defendant had a personal account in the American National Bank. In order to obtain temporary credit in the Reliance bank account defendant engaged in a practice referred to as check "kiting." To accomplish this he would draw a check in a large sum upon his personal account payable to Reliance and this would be deposited in the Reliance account. He would then direct that a check be drawn on the Reliance account in the same amount payable to him and that check would then be deposited in his personal account. Because of the time required in clearing the checks, this was described as amounting to a four-day loan for the benefit of Reliance. The checks written in the "kiting" process for the period of June through October 1963, were as follows: June, $38,000; July, $55,000; August, $88,000; September, $221,-000; and from October 1 to 17, $440,000. Because of this "kiting" practice the Clayton Bank closed the Reliance account in the latter part of October, and the American National Bank requested that defendant close his personal account at about the same time. Defendant then took charge of what had been the trust account in the North Side Bank and it thereafter became the bank account of Reliance.

In order to cover the outstanding checks at the time the account was closed at the

Clayton Bank defendant directed that a cashier's check for $14,000 be delivered to that bank. That money was obtained from the proceeds of the sale of property located at 2341 Esther Street for which the seller never received the money due him. Defendant gave a similar cashier's check for $1,156 to American National to cover checks that had been written upon his personal account.

When the account was closed in the North Side Bank on January 8, 1964, it was overdrawn in the amount of more than $19,000. It was also shown in evidence that there were ten transactions in which property was sold wherein defendant received the purchase price, and in which the seller never received the amount due for the sale of his property. The amount involved in those transactions was more than $100,000.

It was developed on cross-examination of the bookkeeper for Reliance that the corporation had accounts receivable of almost $200,000 ($115,000 of that amount having been advanced to agents upon drawing accounts), many items of which were eight to ten years old and uncollectible. There was evidence to indicate that the collectible assets of Reliance did not total more than a few thousand dollars.

Angelo and Irene Branca both testified that they were ready and willing at all times to transfer title to Miss Lenau but did not do so because they never received the portion of the purchase price due them. Mrs. Branca testified that she called defendant twice in December in an effort to get the deal closed, and on one occasion when defendant said he had to attend a meeting offered to wait for him at their home until midnight if necessary. She stated that they had a warranty deed prepared and executed and took it to the January meeting so as to be prepared to convey title to Miss Lenau in the event they received the purchase price.

Miss Lenau complained to the circuit attorney on January 10, 1964, and defend-

ant was arrested on this charge the next day.

Defendant testified that when Miss Lenau came to his office on December 5, 1963, she paid him the amount due on the purchase price and other expenses, but that the closing was delayed because she desired to obtain certain insurance policies; that he obtained the policies and then designated December 18 as the closing date but that the transaction was not closed at that time because he could not get the Brancas to come in because Mr. Branca was working. He stated that Mrs. Branca indicated that they were in no hurry to close because they were building a house and would like to delay moving for ninety days; that he later agreed to close the transaction on January 10, but prior to that date he received unfavorable publicity which nullified any possibility of continuing in business and that he closed the office on January 8; that he could have closed the transaction in January 1964, except for the unfavorable publicity, because he had an arrangement for a $60,000 personal loan from relatives which was contingent upon his continuing in business; that he also had a deal tentatively arranged which, if consummated, would have resulted in the receipt of a commission of $75,000.

On cross-examination defendant admitted that he never returned the money to Miss Lenau which had been paid to him, and never "gave" her the property she had paid for. He admitted that he authorized the issuance of all checks on the Reliance account and knew, when Miss Lenau's check was deposited, that checks had been written on the Reliance account which would indicate on its checkbook an overdraft of $8,200, but denied that the bank account itself would indicate such an overdraft. He further admitted that he knew when he issued checks totaling $440,000, payable to Reliance, in October 1963, that there were no funds in his account to pay them. He said that the kiting arrangement was just an exchange of checks and that it was done to indicate more activity or a larger bank ac-

count which he thought would help in an effort to get loans for Reliance; that in each instance where persons were not paid the amount due them upon the sale of their property there was some reason why the closing of the transaction had been delayed. He stated that during all the period in question he received a salary from Reliance of $1,000 a month and that during that time his personal bank balance would seldom exceed $1,000. He admitted that he did not obtain Miss Lenau's permission to use the money she had paid him for corporate purposes.

Defendant also presented four character witnesses who testified that he had a good reputation in the community for honesty and integrity.

In rebuttal the State produced Melvyn P. Cange, President of the Clayton Bank, who testified that from October 1 to October 25, 1963, Reliance deposited $498,000 in its account, but that there was actually no cash available in the account to pay checks issued thereon.

Joseph D. Weis, Assistant Cashier of American National, also testified in rebuttal that during October 1963 defendant issued checks on his personal account totaling $529,000, and that there was no actual cash available in the account and he therefore requested that defendant close the account.

Further facts will likely be stated in connection with our disposition of certain points briefed by defendant.

■ The indictment alleged "that the said Leonard Niehoff did then and there intentionally, feloniously and unlawfully steal, embezzle and convert the same monies to his own use without the consent of the said Verna Lenau * * *." Defendant filed a motion to make that allegation more definite and certain so that it would state whether defendant caused the transfer of the money in his individual capacity and used it for his personal purposes, or transferred it as an officer of Reliance either to his personal use or to the use of Reliance in furtherance of its business. He here contends that the trial court erred in overruling that motion. The cases cited by defendant properly state well-known rules relating to the requirements of an indictment. Those rules were not violated in this case. The indictment alleges the essential facts constituting the offense. It alleges that defendant, as president of Reliance, obtained possession of $14,100, the property of Verna Lenau, and did embezzle and convert same to his own use, without the consent of Verna Lenau. It is not essential that it allege what he did with the money. The offense would be complete regardless of whether defendant converted it to his own personal use or to the use of Reliance. We rule that the court did not err in overruling the motion.

■ Four indictments were returned against defendant. Three (including the instant one) charged thefts from individuals. The fourth charged that defendant, as president and treasurer of Reliance, had custody of a total of $185,000, the property of the corporation, which (between April 30, 1961, and December 31, 1963) he converted to his own use without the consent of said corporation. Defendant filed a motion to consolidate the instant indictment with the one last described. His theory was that the Lenau charge was included within the charge of systematic thefts from Reliance over a period of time. He contends that the court erred in overruling that motion. We do not agree.

It seems clear to us that since the two indictments charge thefts from different persons they should not have been consolidated. Also, there is some suggestion in the brief concerning double jeopardy but, since this was the first charge tried, it is obvious that said defense could not have been interposed in this case. This point is ruled adversely to defendant.

■ Over the objection of defendant Miss Lenau was permitted to testify that she obtained the $15,256 here involved by inheritance, hard work, and by borrowing from her family. The next contention of

defendant is that the court committed prejudicial error in admitting that testimony because it was irrelevant and would tend to inflame the minds of the jurors and create sympathy for the witness.

Strictly speaking, the evidence complained of was irrelevant. However, we are convinced that it was not prejudicial. The jurors knew, of course, that this money had to come from some source. The testimony specified three sources and was very general in that it did not state the amount obtained from each source. If the jury had any sympathy for the witness it was because she lost a large sum of money. There was nothing unusual about the manner in which she obtained the money and we cannot believe that the jury was concerned about the source of the money or influenced by the testimony relating to that fact. We are supported in our view by the case of State v. Burgess, Mo.Sup., 193 S.W. 821 [4]. In support of his contention defendant has cited State v. Baublits, 324 Mo. 1199, 27 S.W.2d 16, State v. Johnson, 349 Mo. 910, 163 S.W.2d 780, and State v. Cavener, 356 Mo. 602, 202 S.W.2d 869. Those cases are readily distinguishable upon the factual situation involved. Johnson and Baublits related to testimony concerning the number and ages of the children left by the deceased in a murder case. In Cavener the question was whether it was prejudicial to permit evidence to the effect that the homicide victim belonged to a certain church and lodge.

We rule that the testimony in question, though immaterial, was not prejudicial and its admission would not warrant a reversal of the judgment herein.

Defendant contends that the court erred in admitting evidence that he "kited" checks because such evidence was irrelevant, constituted proof of unrelated crimes, and presented collateral issues which tended to confuse and inflame the jury. In that connection his brief contains the following: "To establish intent the State was allowed to show instances of eleven separate incomplete real estate transactions, that the corporate bank account was overdrawn most of the time, and that the defendant was kiting checks between banks. While it may have been competent to show the eleven instances of similar incompleted transactions to establish the absence of mistake or accident, and competent to show that the bank balance at or near the time of the crime in question was overdrawn to establish intent by showing the defendant's need of these extra funds, the fact that he was kiting checks between banks had no legitimate tendency whatsoever to directly establish the defendant's guilt of the charge for which he was on trial."

▮ As a general rule proof of the commission of other crimes by the defendant is not admissible. However, "the recognized exceptions to the rule are where the evidence of other crimes tends to establish: (1) Motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the defendant." State v. Garrison, 342 Mo. 453, 116 S.W.2d 23, 24.

▮ We have concluded that the evidence in question was properly admitted. The act of defendant in accepting the money of Miss Lenau and depositing it in the account of Reliance, considered alone, was susceptible of an innocent explanation. The evidence of defendant's check "kiting" showed his desperate need for money in order to keep his business operating and tended to establish his motive and intent in converting the money immediately after it was received. We are mindful that there was an unusually large amount of evidence in this case relating to other crimes and improper business practices of the defendant but it appears that all of the matters shown come within the scope of the exceptions heretofore quoted and hence the court did not err in their admission. We accordingly rule this point against defendant.

■ In the next point briefed defendant contends that the court erred in refusing to permit him to testify to four items of evidence which he says were material to his defense. The main contention under this point relates to the following: "Q (by Mr. O'Hanlon: Did you intend to steal the money? Mr. Friedman: I object to that question as totally—The Court: It will be sustained. Q (Mr. O'Hanlon) Did you intend to convert the money to your own use? Mr. Friedman: I'll object to that, Your Honor. The Court: That is a matter for the jury to decide." Defendant says he should have been permitted to give direct testimony as to his intent. We agree that the better practice would have been to permit defendant to answer the two questions set out above. However, we do not think the exclusion of the testimony constituted reversible error. In the first place we observe that the facts relating to the theory of the State and the defendant's theory of defense were fully developed in the evidence. Where, as here, the facts from which the jury may determine the intent of the defendant are fully presented, the defendant's conclusionary statement as to his intent would not have been of much value. Moreover, we note that no offer of proof was made and we would be justified in disregarding this point for that reason. State v. Dill, Mo.Sup., 282 S.W.2d 456 [12]. We rule that the error in sustaining the objections heretofore set out does not require a reversal of the judgment.

Defendant contends that the court erred in refusing to permit him to testify that Reliance was placed in receivership in January 1964, but he has obviously overlooked the following question and answer: "Q. Actually, you went into receivership in January; is that correct? A Yes, sir."

■ It is also contended that the court erred in excluding defendant's testimony as to "how many transactions were closed satisfactorily in 1963 and how much money per month passed through the operation of the company." While in one instance the court did sustain an objection to testimony of that nature, we find that at another time defendant testified as follows: "Q How many closings did you have a month? A Oh, between thirty, thirty-five. Q Would it be fair to say that they averaged about ten thousand a closing? A Yes, I guess so. Q So that is three hundred and fifty thousand a month business? A About that, yes, sir." It is obvious that this point is without merit.

Defendant also asserts that the court erred in excluding his testimony concerning "the faltering financial condition of the Company in 1963; for the reason that this was relevant to explain that the financial loss of Verna Lenau and the eleven others mentioned in testimony was due to business failure and not criminal intent." He has failed to specify the precise testimony he claims was excluded but we have no hesitancy in ruling that no prejudicial error occurred in that regard. There was an abundance of evidence presented by each side which unquestionably disclosed the "faltering financial condition of the Company," and defendant testified fully in regard to the facts upon which his theory of defense was founded.

■ Henry Mohr, over the objection of defendant, testified that over a period of years he made a number of requests of defendant in an effort to get the financial picture of the company. He produced copies of five letters he wrote to defendant which (although not filed here) apparently had something to do with those requests. After an extended discussion (outside the hearing of the jury) the court sustained defendant's objection to the admission of the letters. Although the contents of the letters were not disclosed to the jury the court, at defendant's request, told the jurors that they were "instructed to disregard any reference to the letters." A motion for a mistrial was overruled. Defendant now contends that the testimony of Mr. Mohr and the reference to the letters constituted prejudicial error. We do not agree. The display of the

letters without revealing their contents to the jury, particularly when considered in connection with the admonition of the court to disregard any reference thereto, could not be considered as prejudicial to defendant. Likewise, we are unable to understand how defendant could have been prejudiced by the fact that Mr. Mohr made requests of him in an effort to determine the financial condition of the Company. His testimony did not indicate whether said financial condition was good or bad. We accordingly rule that no prejudicial error occurred in connection with the evidence of witness Mohr in the respects herein complained of.

The next point briefed by defendant is that the court erred in overruling his objections to the rebuttal testimony of witnesses Cange and Weis concerning the actual cash credit available in the accounts in the Clayton Bank and the American National Bank. He says that said evidence was cumulative of the State's evidence in chief and did not rebut any new matter adduced by defendant. We agree with the ruling of the trial court that the testimony was proper rebuttal because defendant, on cross-examination, had equivocated a great deal concerning the actual cash credit available in said accounts during the check kiting activity. In some of his answers defendant took the position that he had the amount of money in the accounts that was shown by the deposits even though the checks deposited were those involved in the kiting process. Moreover, we have said that "the scope of rebuttal testimony is largely within the sound discretion of the trial court, and, unless the trial court has abused its discretion to the prejudice of defendant an appellate court will not reverse on that ground, even though the evidence is not strictly or entirely rebuttal evidence." State v. Sawyer, Mo.Sup., 365 S.W.2d 487, 491. We see no indication that the trial court abused its discretion in this instance. The point is overruled.

Instruction No. 3 contained the following: " 'To his own use,' as these words are used in this instruction, means the felonious and wrongful appropriation of the property of another for some use inconsistent with the rights of the owner and against the owner's will." Defendant contends that said definition was erroneous because "the jury was not required to find one way or the other in regard to the issue of whether the defendant was guilty of stealing money for his own personal use, or was guilty of stealing money for the use of the Reliance Real Estate Company." As we have already indicated, it is immaterial whether defendant converted the money to his personal use or to the use of Reliance. It follows, therefore, that defendant's contention of error in regard to the quoted portion of the instruction is without merit.

Defendant also contends that the court erred in refusing to give his submitted Instruction "A" which he says is a converse of the State's main Instruction No. 2. " * * * the rule now seems established that a defendant is ordinarily entitled to have given a correct instruction submitting the converse of the state's main instruction; but, if the given instructions fully and fairly cover the same subject matter contained in defendant's converse instruction, it is not prejudicial error to refuse the instruction offered. * * *." State v. Engberg, Mo.Sup., 377 S.W.2d 282, 286. See also, State v. Boyd, 354 Mo. 1172, 193 S.W.2d 596, State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734 [8], and State v. Elgin, Mo.Sup., 391 S.W.2d 341 [12].

Given Instruction No. 2 hypothesized in meticulous detail all of the facts required for a finding of guilt and most of those facts are required to be found twice in the instruction and therefore could hardly have been overlooked by the jury. Every fact required to be found in Instruction "A" is clearly hypothesized and required to be found in Instruction No. 2. Actually, the only disputed issue in the case related to defendant's intent and "A" submitted no new theory of defense in that regard. Furthermore, No. 2 concluded with these

words: "and unless you find the facts to be as set forth herein, you will acquit the defendant." And Instruction No. 5 told the jurors that the evidence must establish defendant's guilt to their satisfaction and beyond a reasonable doubt and if they had a reasonable doubt of his guilt they should acquit. Moreover, we are of the opinion that "A" was objectionable because it used the word "mere" in submitting the main facts, which, in our view, tended to improperly depreciate the importance of the submission. For example, it contained the following: "that *mere* failure to pay over money" and "the *mere* conversion of it [money] by the defendant."

In the situation presented, we have concluded that the refusal of the instruction was not reversible error. In support of his contention defendant has cited State v. Chevlin, Mo.Sup., 284 S.W.2d 563, State v. McWilliams, Mo.Sup., 331 S.W.2d 610, and State v. Markel, 336 Mo. 129, 77 S.W.2d 112, in each of which this court reversed because of the refusal of an offered converse instruction. However, each of those cases involved circumstances and instructions quite different from those in the instant case and are not authority for a reversal of this judgment.

█ The last point briefed is that the court erred in sustaining various objections to portions of the argument of defendant's counsel. The first statement referred to is as follows: " * * * Whether he is a thief or whether he is a default business man is the issue; whether this man is guilty of stealing intentionally, unlawfully, or whether perhaps he is guilty of, in a vain attempt, a fatal attempt to salvage his business. On the one hand he is a criminal; on the other hand he is an insolvent. Mr. Friedman: Again, Your Honor, I will object to this, and ask the jury be instructed to disregard it. No showing of this defendant's financial affairs;—The Court: Sustained." This ruling could not have been prejudicial because very shortly thereafter he was permitted to make the same argument without objection.

█ The next complaint relates to the following: " * * * Where is there anything in this evidence where this man ever derived anything personally from these transactions? Is there any evidence that he lived in Ladue or drove a Cadillac, or was in Florida? Mr. Friedman: I object. That is all beyond the scope of the evidence; has no bearing. The Court: Sustained." We do not think the court erred in its ruling as the argument did not bear upon any issue submitted.

█ We also have the view that the following argument was irrelevant and that the court did not err in sustaining the objection thereto: " * * * if this were a bad year in 1963 for this corporation, but Niehoff stuck it out. He could have, if he wanted to, perhaps in December 1963, closed the door, fired his fifty employees and walked over to the Federal Building and filed bankruptcy. Mr. Friedman: Your Honor, I object to that. It is beyond the evidence in the case and has no bearing or relevancy in the final argument. The Court: Sustained."

█ The next statement referred to is as follows: " * * * you may say, 'Well, Miss Lenau never got the property; she never got the money. I don't know, Mr. O'Hanlon. That is the issue certainly, but isn't this man guilty of something?' Let me see if I can answer that. If you went downtown right now and closed the door of any corporation down there, there are going to be—some people who don't get their money for a while. Mr. Friedman: I will object. It is beyond the scope of the evidence in this case and certainly not proper. The Court: It will be sustained." We think the Court ruled correctly. The argument tended to inject a false issue and did not relate to the issue as to whether defendant converted Miss Lenau's money without her consent.

■ Another complaint relates to the following: "Miss Lenau gets Mrs. Branca and they go down to the Circuit Attorney's Office, and there is adverse publicity in the papers. And, of course, when there is adverse publicity the good will of your corporation is destroyed. Who now is going to say, 'Sell my house, Mr. Reliance Real Estate Company', or who is going to say, 'I am going to buy that house?' And when the good will of a corporation is destroyed, you must close your doors. Do you understand that? That is not an act of insolvency? Mr. Friedman: I object to this line of argument. The Court: It will be sustained. Mr. Friedman: Insolvency, I'll ask that the jury be instructed to disregard it. No showing about Mr. Niehoff's financial status. The Court: The objection will be sustained and the jury instructed to disregard it. Mr. O'Hanlon (Continuing): So when the doors of the corporation are closed, not everybody is satisfied. That cannot be. There is somebody that has to be on the outside." We confess we are unable to understand what was meant by the statement: "This is not an act of insolvency." However, we are convinced that the attorney was permitted to make his point that when the corporation had to close its doors there would be dissatisfied creditors and we accordingly rule that no prejudicial error occurred.

■ The final contention concerns the following argument: " * * * is this man a thief? Did this happen because he deliberately and intentionally wanted to steal her money,— * * * or did this happen by the ordinary procedures of a struggling corporation, and without some bad breaks he probably would have pulled the thing through the winter and have been successful? Remember he had a sixty-five thousand dollar deal coming on an airport property—Mr. Friedman: Your Honor, there is no evidence to substantiate that. Mr. O'Hanlon: The defendant testified to that. The jury will remember the evidence. The Court: The objection will be sustained. Mr. Friedman: I ask that the jury be in-structed to disregard it. The Court: The jury is instructed to disregard it. Mr. O'Hanlon: Your Honor, he testified that he had an airport—The Court: He said he had contracts and negotiations; nothing definite. Mr. O'Hanlon: (Continuing) He had contracts and negotiations, maybe nothing definite, but he told you that he expected to get sixty-five thousand dollars on this contract and other—Mr. Friedman: I object. His expectations are not evidence in this case, and there is no such evidence in this case. The Court: Sustained. Mr. Friedman: I will ask that Mr. O'Hanlon be instructed to refrain from such comments. The Court: Well, there is some evidence that he had contracts and negotiations; if it was sold and if it went through, they would get a fee. I don't recall what it was."

There was testimony by defendant that at the time he had to close his office there was a deal pending from which, if it had been consummated, Reliance would have received a commission of $75,000. It is doubtful whether the argument in question was relevant to the issue as to whether defendant unlawfully converted the money on December 5, 1963. While the court was partially in error as to its recollection of the evidence it was indicated that if defendant sold the property some fee would be received. While the rulings may have been incorrect on the ground contained in the objections we are convinced that no reversible error occurred.

We have read the entire argument of defendant's counsel. When considered as a whole we have concluded that he was permitted to fully and fairly argue his contentions. The trial court has a wide discretion in controlling the argument. We rule that there was no abuse of discretion in this instance.

An examination of the record as required by Supreme Court Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All of the Judges concur.