**STATE of Missouri, Respondent,**

v.

**Howard GOLIGHTLY, Appellant.**

**No. KCD 26173.**

Missouri Court of Appeals,
Kansas City District.

May 7, 1973.

Motion for Rehearing and/or Transfer
Denied June 4, 1973.

Application to Transfer Denied July 16, 1973.

Robert G. Duncan, Gladstone, for appellant; Duncan & Russell, Gladstone, of counsel.

John C. Danforth, Atty. Gen., Daniel P. Card, II, Allan D. Seidel, Asst. Attys. Gen., Jefferson City, for respondent.

Before DIXON, C. J., and SHANGLER, PRITCHARD, WASSERSTROM, SWOFFORD and SOMERVILLE, JJ.

PRITCHARD, Judge.

Appellant was convicted by the verdict of a jury of the commission of the crime of selling marijuana, and his punishment was by it assessed at 15 years imprisonment. Upon the original submission to this court, and a later resubmission to the full court at the April, 1973, Term, the main issues are whether appellant was entrapped into the commission of the offense as a matter of law and whether this court should adopt the so-called "objective test" as opposed to the presently followed "subjective test" of entrapment; and whether the trial court erred in sustaining the state's objection to appellant's argument to the jury that if the state had evidence of other sales by him, it could have brought it before the jury.

In June, 1971, Walter Leo Daffron, III, was given a special assignment to work with the Clay County Investigative Squad as an undercover agent in the area of drug abuse. He was put to work just outside the Gladstone area, where he had occasion to meet a woman named Carlyn Ogden who, in the next two or three months, introduced him to various people who were users, sellers and dealers in the area of narcotics and drugs. About the third week in June, Walter was introduced to appellant early one day. Appellant later arrived at the French Quarter Apartments on Orleans Circle in North Kansas City, but the group of five persons then moved to Carlyn's apartment in Gladstone, "for the purpose of having a pot party." According to Walter before appellant arrived in Gladstone, the five persons were sitting around a table and one of them was rolling handmade cigarettes from a green leafy material brought by one Richie who had what is referred to as a "lid, about 16 ounces or so." When appellant arrived he was handed a cigarette, took a drag off of it, then passed it on. He then produced a bag of his own and asked the people if they would like to smoke "some real good stuff."

Walter and his informant, Carlyn, met next with appellant at his apartment in the first week in July about 4:00 in the afternoon. While Walter talked to appellant about his stereo equipment, Carlyn went to the bathroom, and when she returned she asked appellant "if he knew where we could score any dope or ————." Appellant answered that he did not have any stuff then but was expecting some in two or three weeks, and that he would let them know if he had a chance to procure any. On leaving Carlyn told appellant "to be sure and get hold of us if he got hold of any good stuff." There was a set of balance type scales, which measured from a tenth of a gram up to a pound, in appellant's apartment. Appellant then explained that it had been hard to procure any narcotics, marijuana or grass, in that "things

were tight" in Clay County since the last drug raids in May.

Carlyn called Walter on the evening of July 22, 1971, and told him she had set up a purchase of some marijuana, hashish, from the appellant. Walter then picked up Carlyn and drove to Macklin Park in North Kansas City where they waited for appellant to arrive. Appellant arrived in a sports car pulling up next to Walter's car where he was standing. This then transpired according to Walter: "And he said, 'Are you the one that is here to score the stuff?' And I said, 'Yes.' And he said, 'How much do you want?' And I said, 'Two grams would be fine.' And he said, 'Well, I have got three for you.' I said to him 'Is it really good stuff?' And he said 'Yes'. I said, 'Okay. I will take all three.' And he said it was $7.00 a gram. I handed him $21.00 and he handed me three tinfoil wrapped packages with a black material inside which I confiscated and kept." The package was turned over by Walter to Captain Arthur Piburn the following day, and later Kaaren Huselton made chemical tests and determined that the substance was marijuana. Walter explained that hashish is made by boiling marijuana stems for about 36 hours until a resin is gotten out of them, which is boiled again and again until a concentrate, the residue, or precipitate, results. The residue is placed in small amounts on a perforated tinfoil on a pipe, lighted and inhaled by the user.

On cross-examination Walter testified that he was introduced to Carlyn who was supposed to go out and find people and to try to go out, make arrangements and set up business. He made about fifteen purchases from nine people to whom she introduced him. Carlyn was an informant and was a user of marijuana. It was stipulated that she was arrested and charged in May, 1971, with the crime of possession of marijuana, and the charge was dismissed on August 9, 1971, by the Clay County Prosecuting Attorney. At the time of trial Carlyn was apparently in Canada.

Appellant testified that he had known Carlyn for probably a year before July, 1971. He had purchased some marijuana or "hash" from her and her friend, Marsh, and thereafter smoked some of it. Carlyn had invited appellant to her apartment where he met Walter who was known as "Duck." On July 22, 1971, the date appellant was charged with selling marijuana to Walter, Carlyn called him at his work at Harrigan Motors and told him she had a friend in town who was leaving for Denver, and he wanted to buy some hash or some form of marijuana. Carlyn wanted to know if appellant had any, and he told her he did not. She then called him about five times that day at work, finally saying to him, " 'Okay, I will take full responsibility for them. They are friends of mine.' "

On each call appellant told her he did not have any. Eventually, when he got home about 7:00, the phone rang again and Carlyn said, " 'One last time, do you have any?' And I had a roommate at the time that didn't smoke. And I was afraid of getting caught with the stuff. I had three little things left, and I told her I would just rid of all of them. And she said 'All right. Charge him $7.00 a package.' I said 'Okay.' And she said 'Meet us over at ————' whatever that tennis court, whatever it was. Q. At Macklin Park, you mean? A. Yes, sir. Q. And did you meet them? A. Yes, sir." As to his source of this particular marijuana or hashish, appellant further testified that Carlyn's friend, Marsh, brought it over and appellant bought it from Carlyn and Marsh. Appellant had never been convicted of anything other than traffic violations, and he agreed to make this sale for these reasons: "A. I just wanted to get rid of the stuff. I just felt the penalty wasn't worth what everybody had done it for. Q. You mean possession of it? A. Yes, sir. Q. And would you have sold it except for Carlyn's phone calls? A. Probably not, no, sir." It was brought out on cross-examination of appellant that he had the quarter of an ounce of hash for

about two weeks, and he did not make a profit on it when he sold it. He denied recollection of Carlyn and Walter coming to his apartment asking if he knew "where they could score some good stuff and telling them it was tight right now but you would have some coming in a couple of weeks."

At the request of appellant, Instruction No. 5 was given: "One of the issues in this case on which the state has the burden of proof is whether the defendant was lawfully (sic) entrapped into committing the offense submitted in Instruction No. 4. Even if you find and believe from the evidence beyond a reasonable doubt that the defendant engaged in the conduct submitted in Instruction No. 4, nevertheless you are instructed that unless you also find and believe from the evidence beyond a reasonable doubt: First, that the defendant was ready, and willing to engage in the conduct, and Second, that the officer and informer only provided the defendant with the opportunity to engage in the conduct, you must find the defendant not guilty." Appellant also requested Instruction No. 7 which was given: "You are instructed that Carlyn Ogden, at the time and place of the alleged sale of marijuana, was acting as an agent of the State of Missouri."

The subjective test of entrapment of a defendant who has at least had the participating of government agents or informers in the commission of the offense charged has been followed in this state in State v. Van Regenmorter, 465 S.W.2d 613 (Mo. 1971); and State v. Taylor, 375 S.W.2d 58 (Mo.1964). These recent Missouri cases have followed the doctrines of the majority opinions in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); and Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). In Sorrells the facts were that Martin, a prohibition agent, went with three residents of defendant's home county, whom defendant knew well, to defendant's home. The agent who was introduced as a tourist informed defendant that he was an

ex-service man and that he and defendant had been in the same Division. The agent made two requests of defendant to get him some liquor, without result. Then, after a conversation with defendant and another ex-service man, a third request to defendant by the agent was successful. There was evidence from defendant's witnesses that he had been further opportuned by the agent, and the Government called witnesses who testified that defendant's general reputation was that of a rum-runner. The court noted that the evidence was sufficient to warrant a finding that the charged act was instigated by the agent; that the defendant had no previous disposition to commit it; but was lured to its commission by repeated and persistent solicitation in which the agent took advantage of the sentiments aroused by experiences as companions in the World War. It was said that the gross abuse of authority given for the purpose of detecting and punishing crime, and not for the making of criminals, deserved the severest condemnation. The court noted that it was well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the crime does not defeat the prosecution. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." But a different question is presented when the criminal design originates with the officials of the government who implant in the mind of an innocent person the disposition to commit an offense and induce its commission in order to prosecute. The Sorrells majority held merely that under the evidence the defense of entrapment was available, and that the trial court erred in holding that as a matter of law there was no entrapment and in refusing to submit the issue to the jury.

The Sherman case held under its facts that entrapment was established as a matter of law entitling the defendant to dismissal of the indictment. The court reached that conclusion from the undisputed testimony of the prosecution witnesses.

One Kalchinian, a government informer, and Sherman were both apparently being treated to be cured of narcotics addiction, and became acquainted at the doctor's office or the pharmacy. Kalchinian finally asked Sherman if he knew of a good source of narcotics, and to supply him with a source because he was not responding to treatment. Sherman finally acquiesced after a number of repetitions of the request, "predicated on Kalchinian's presumed suffering." After several times that Sherman obtained narcotics, sharing them with Kalchinian, whom Sherman told owed him part of the costs, he informed narcotics agents that he had another seller for them. The agents thereafter observed Sherman give narcotics to Kalchinian in return for money supplied by the Government. The court did not depart from the majority opinion in Sorrells, but reiterated the above quotations from that case. The court said further, "Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law enforcement officials. * * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. * * * On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim to innocence." Loc.cit. 356 U.S. 372, 373, 78 S.Ct. 821.

■ The Sorrells and Sherman cases laid down the "origin of intent" or "subjective" test for entrapment, so well analyzed in the comment, "Entrapment: A Critical Discussion", 37 Mo.L.Rev. 633 (1972) in which the evaluation of the defense of entrapment, and the resulting solidification of the subjective test in this state, is traced. The leading case is State v. Decker, 321 Mo. 1163, 14 S.W.2d 617 (1929), decided before Sorrells, but which cited and followed Butts v. United States, 273 F. 35 (8th Cir. 1921), which at pages

37 and 38 set forth the subjective test. Other cases applying the test are: Kansas City v. Martin, 369 S.W.2d 602, 606[5, 6] (Mo.App.1963); and State v. Hammond, 447 S.W.2d 253 (Mo.1969), wherein an instruction on the subject was approved (but before the submission of Missouri Jury Instructions, Criminal [MOJIC], cf. 3.28 and 3.30). As contrasted, the "objective" test of entrapment, the adoption of which is here urged by appellant, considers only the nature of the police activity or governmental conduct involved, without reference to the predisposition of the particular defendant to commit the crime. In view of the Sorrells, Sherman and other cases above cited, all of which firmly establish the subjective test of entrapment in Missouri, which cases must be followed by this court, appellant's proposition is rejected.

■ Appellant insists that entrapment existed as a matter of law and therefore his motion for judgment of acquittal should have been sustained. He relies on State v. Hicks, 326 Mo. 1056, 33 S.W.2d 923 (1930); and did rely on United States v. Russell, 459 F.2d 671 (9th Cir. 1972), but the Russell case was reversed, United States v. Russell, —— U.S. ——, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); United States v. Bueno, 447 F.2d 903 (5th Cir. 1971); and United States v. Chisum, 312 F.Supp. 1307 (C.D.Cal.1970). Those cases may be factually distinguished from this case. In the Hicks case, the evidence showed that federal officers originated the criminal intent and induced defendant to procure and sell whisky to them by obtaining his confidence and playing on his sympathy *required an instruction on entrapment*, for which the judgment was reversed and the case remanded for new trial, not outright reversal. In view of the Supreme Court's decision in Russell, adhering to the subjective test of entrapment, it is doubtful that Bueno and Chisum are of any import.

Here the facts are that Walter, an admitted state undercover agent, was introduced to appellant by Carlyn, concededly a state informer. It is by no means clearly established by appellant's testimony that Carlyn, as an informer, supplied him with the particular hashish he sold to Walter. Appellant's testimony was merely that Carlyn's friend Marsh brought over the hashish, and appellant bought it from Carlyn and Marsh. There is no evidence that Walter had anything to do with that transaction. Nothing more appears here than permitted "artifice and stratagem" to catch appellant for selling prohibited marijuana. Walter was merely introduced to him on an occasion, the "pot party," when it became known to Walter that appellant had possession of marijuana. It was thereafter that Carlyn importuned appellant to furnish marijuana, he having previously upon inquiry stated that he did not have any stuff then but was expecting some in two or three weeks, and he would let them (Carlyn and Walter) know if he had a chance to procure any. By contacting appellant, albeit five times in one day, to furnish marijuana which he possessed to Walter. The events of the evening of July 22, above related, further substantiate the fact, for the jury to determine, that it was appellant's criminal design to make the sale to Walter. It does not even clearly appear, though contended by appellant, that he made no profit from the sale. There is no undue inducement or overreaching of appellant as was present in the Russell, Bueno and Chisum cases. There were no blandishments of any type proffered him, no promises of extravagant amounts of money, and nothing tendered to engender his sympathy, which are mentioned as types of actions warranting a jury instruction on entrapment in 37 Mo.L.Rev. 645, 646, and cases cited. Note also the cases not showing and those tending to show entrapment collected in 33 A.L.R.2d 883, 891 et seq. See also State v. Weinzerl, Mo. App., 495 S.W.2d 137; and State v. Admire, Mo.App., 495 S.W.2d 132, both handed down concurrently herewith.

From a consideration of all the evidence, the trial court did not err in overruling ap-

pellant's motion for judgment of acquittal based upon entrapment as a matter of law, but properly submitted the matter to the jury by Instruction No. 5. State v. Taylor, 375 S.W.2d 58, 59 [1–3].

In opening argument counsel for the state urged that a conviction should be had based generally upon the proof of the *one* sale of marijuana to Walter, but did put a question to the jury, "Is this fellow, when you decide how much punishment to give him, *regularly* selling the stuff, happy to sell it, willing to sell it to anybody?" (Italics added.) At another point argued, "You can find him guilty and say five years is plenty for selling marijuana and we ought not to deal harshly with the *purveyors* of this kind of stuff, or you can increase the minimum sentence." (Italics added.) There was evidence only of the one sale upon which appellant was charged. Counsel for appellant then argued: "He is charged with one sale. He testified if they had any other evidence —now, when he testified he was subjected to cross examination. He has put his character in evidence. And under our law, prosecution had the right to bring out anything they could in the realm of admissible evidence to show he had a bad character. They had a right to inquire, bring out other evidence they had that he ever sold anything other than used cars. MR. MALONEY: Objection, your Honor. We did not have that right. We could have proven convictions. We could not—MR. DUNCAN: I think in entrapment, you can. THE COURT: No, I don't think so. Objection will be sustained MR. DUNCAN: (Continuing) We heard no other evidence of any other sales from Mr. Daffron. * * *." Appellant's counsel then argued that the lack of evidence of the presence of marijuana in appellant's apartment was a pretty good indication that he was not a big or even a little dealer. "He obviously is not a dealer." In closing argument counsel for the state went on to argue that if the jury thought appellant was a dealer, "give him a lick", that drug

traffic strikes at the very heart of American society, a number one domestic problem to be dealt with by tough juries; that as to punishment what appellant told Carlyn and Walter, "I don't have anything now. Things are tight. I will be able to get it in a couple of weeks"; that the balance scales in appellant's apartment [were] necessary to dish out hash or marijuana; "Is this fellow, when you decide how much punishment to give him, regularly selling the stuff, happy to sell it, willing to sell it to anybody? 'I can get it for you in two weeks'"; "You can find him guilty and say five years is plenty for selling marijuana and that we ought not to deal harshly with the purveyors of this kind of stuff, or you can increase the minimum sentence"; "I think the scales that he used for packaging his product should be considered by you and time added for that". There was further argument that undercover agent Walter's purpose was to get sellers and dealers, not even arresting users at all. There was no objection to this latter argument.

It is probably true in this state, as in some other jurisdictions (although no Missouri cases are cited or found) that the state, as an exception to the admissibility of proof of other crimes, cf. State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954), may show other sales of marijuana or narcotics *to rebut* the defense of entrapment. See Sauvain v. United States, 31 F.2d 732 (8th Cir. 1929); Billingsley v. United States, 274 F. 86, 91 [10] (6th Cir. 1921); Carlton v. United States, 198 F.2d 795, 798 [4] (9th Cir. 1952), and cases there referenced; People v. Fong, 129 Cal.App.2d 667, 277 P.2d 859, 860 [3, 4] (1954); State v. Vallejos, 89 Ariz. 76, 358 P.2d 178, 180 [3] (1960); and Watson v. State, 382 P.2d 449, 453 [10] (Okl.Cr.App. 1962). The reason for the exception is that a defendant's own criminal design and his predisposition to commit the offense are relevant factors under Sorrells, supra. It is in this posture that appellant contends that the court erred in sustaining the

state's objection to his argument of a *lack* of proof of other sales of marijuana. If the record disclosed that the matter ceased upon the sustaining of the objection, appellant's point would be premised upon sound ground. But that is not what happened. Counsel went on to argue, "We heard no evidence of any other sales from Mr. Daffron"; that the lack of evidence of the presence of marijuana in appellant's apartment was a pretty good indication that he was not a big or even a little dealer; and "He obviously is not a dealer." Thus, appellant got before the jury in argument precisely what he desired, and any error of the court in sustaining the previous objection was rendered harmless under the analogous case of State v. Niehoff, 395 S.W.2d 174, 183 [14] (Mo.1965); and see State v. Gray, 423 S.W.2d 776, 786 [19] (Mo.1968), as to counsel for defendant getting his point across in further argument after an objection was sustained by the court.

In his original brief, appellant makes two more points. The first is that he was unconstitutionally denied due process of law and equal protection of the law in that Sec. 195.200, RSMo 1969, V.A.M.S., unreasonably and without just cause punishes one who sells marijuana with the same severity and harshness as the seller of narcotics and dangerous drugs under Sec. 195.017. He is asking this court to recognize and declare that marijuana is not a narcotic drug nor is it dangerous and addictive to the extent that its seller should be punished with the same severity and harshness as the seller of heroin, cocaine, morphine, etc. The contention is answered by the established law in this state that it is a legislative function to define and punish crime, as set forth in State v. Stock, 463 S.W.2d 889, 895 [Mo.1971]. The second original point is that appellant was subjected to cruel and unusual punishment and excessive punishment by the imposition of a sentence of 15 years upon him. It is sufficient to say that the punishment was within the range of five years to life imprisonment authorized by Sec. 195.200,

RSMo Supp.1971, V.A.M.S. For this reason the case is not subject to reversal on appeal because of claimed excessiveness. State v. Phillips, 480 S.W.2d 836, 837 [4].

The judgment is affirmed.

All concur.