**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Billy Charles FELKINS,
Defendant-Appellant.**

**No. 11093.**

Missouri Court of Appeals,
Southern District,
Division Four.

March 12, 1980.

Motion for Rehearing and Transfer
Denied March 28, 1980.

Application to Transfer Denied
May 1, 1980.

John D. Ashcroft, Atty. Gen., Lew A. Kollias, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Bruce W. Simon, Simon, Simon & Katz, P. C., Kansas City, Dee Wampler, Wampler & Wampler, Springfield, for defendant-appellant.

BILLINGS, Judge.

A Barry County jury deliberated for less than an hour in finding defendant Billy Charles Felkins guilty of the sale of a controlled substance [62 pounds of marijuana], in violation of § 195.020, RSMo 1978, and fixing his punishment at 30 years imprisonment. In this appeal he contends that the trial court erroneously admitted evidence of other offenses by him, his tendered definitional instructions should have been given, and the evidence failed to establish a "sale" of the forbidden substance and the court should have entered a judgment of acquittal. We affirm.

The verdict was entered April 25, 1978, and at defendant's request he was granted an additional twenty days in which to file a motion for new trial. His motion was filed one day late, on May 26, 1978, and consequently, preserves nothing for appellate review. *State v. Richardson*, 519 S.W.2d 15 (Mo.1975); *State v. Eaton*, 568 S.W.2d 541 (Mo.App.1978); Rule 27.20, V.A. M.R.

Notwithstanding defendant's failure to comply with the rules governing criminal appeals, we have reviewed the transcript to determine whether or not the plain error provision of Rule 27.20(c), V.A.M.R., is applicable. For the reasons which follow, we conclude that it is not.

Trooper Robert Currier of the Missouri State Highway Patrol was working as an undercover narcotics agent and became acquainted with Billy Ray in the Joplin, Missouri, area. Prior to October, 1976, he purchased various controlled substances from Ray. On the night of October 11, 1976, Currier was negotiating with Ray for a large purchase of marijuana. During these negotiations Ray demanded to see the purchase money before he went any further. Currier left and later returned with Sgt. Robert Ashurst, another undercover narcotics agent, to the car where Ray was waiting. Sgt. Ashurst showed Ray $7,000 in one-hundred dollar bills. Ray said there had been some difficulties and "they had some problems with getting their connections together. Some of them had been arrested in Dallas and that they were sorry that it had been delayed but would definitely have the marijuana in Joplin the following day . . . by one o'clock and that his man was prepared to handle everything . . . .." Later that night, about midnight, Ray telephoned Currier at his motel room. Currier left the room and went to the motel parking lot, where Ray and defendant were sitting in Ray's car. Defendant said he had only heard about two hours before that [Currier and Ashurst] were interested in a "large quantity of pot" and he "would handle the situation and there would be no further problems." Defendant asked Ray if he had seen the money and Ray replied that he had. Defendant asked Currier if he knew a certain party in Kansas City who "was a big dealer up there" and described "some gold marijuana in five-pound wheels" he would be getting in the future, and that he "would be running a load to Kansas City frequently and could deliver this stuff to [Currier and Ashurst] in the future in person." Defendant said they would complete the transaction the next day, explaining "this was different than what we had previously agreed upon because where this stuff was kept in Dallas was in a warehouse and the individual was going to pick it up and transport it to him in Missouri the following morning and be here between one and three in the afternoon."

The next day Ray brought a "brick" of marijuana to the agent's room and told the two agents it was a sample of "what we have . . . the price is a hundred and ten dollars a pound." Sgt. Ashurst inspected the marijuana and offered to pay Ray at that time for the "brick", but Ray said Ashurst could pay the man that brought the

rest of the marijuana. Ray made a telephone call from the room and twenty minutes later defendant arrived. When defendant entered the room he asked Ray "if everything was cool", if Ray had "seen the money", and said he had "two tons of this same stuff if [agent] was interested." Defendant and Trooper Currier then went to defendant's car. Defendant unlocked the trunk and the two men removed scales and two duffle bags containing 62 pounds of marijuana pressed into five-pound "bricks." They returned to the room where Ray and Sgt. Ashurst were and, while the "bricks" were being removed from the duffle bags and weighed, defendant again stated that he "had two tons of the stuff, that if the hurricanes ever finally cleared up down there, that they would be able to get planes out . . . and should be no problem if [agent] wanted to do that on a regular basis." Defendant then suggested to Sgt. Ashurst that they commence counting the money while Ray and Trooper Currier weighed the marijuana. At that point, the officers drew their guns and arrested Ray and defendant.

■ Defendant's statements that he had two tons of marijuana and would be able to get planes out when the hurricanes cleared were relevant on the intent or motive of defendant as to the instant charge. *State v. Tilcock*, 522 S.W.2d 60 (Mo.App.1975). "Defendant's cited cases all deal with the state offering or arguing evidence of *prior* crimes. This evidence was as to the proposed commission of a subsequent offense and of a nature so as to bear directly on the intent or motive or [sic] the defendant as to the instant charge. Clearly, this evidence is within the exception permitting such proof to show motive or intent. *State v. Niehoff*, 395 S.W.2d 174, 180 (Mo.1965)." 522 S.W.2d at 62. Defendant's statements were also admissible as part of the res gestae. *State v. McClure*, 504 S.W.2d 664 (Mo.App.1974). Furthermore, defendant's statements about his acquiring "some gold marijuana" in the future and "would be running a load to Kansas City frequently", were admitted without objection.

■ Defendant's claim that the state's verdict director did not properly instruct the jury and that his tendered instructions, defining "sold" and "sell", should have been given, are without merit. The verdict director followed the text and notes on use of MAI–CR 14.10. No definition of "sale", "sell", or "sold" is required. Defendant's contentions in support of his refused instructions, as well as his averment that the evidence was insufficient to support the charge against him, are fully answered by *State v. Tierney*, 584 S.W.2d 618 (Mo.App. 1979) at 623:

"The defendant contends also that the evidence did not prove a sale within the elements of the criminal statute. The defendant likens a sale of a controlled substance to a commercial transaction of any other goods with a fixed price, delivery and payment. *Sale* as used in the Narcotic Drug Act, and as charged against the defendant, however, condemns a far more encompassed activity. [§ 195.010—(30)—Definitions]:

"*Sale* includes barter, exchange, or gift, or offer therefor, and each such transaction made by any person, whether as principal, proprietor, agent, servant or employee.

"The defendant derives his contention from *State v. Sykes*, 478 S.W.2d 387 (Mo. 1972) and *State v. Lemon*, 504 S.W.2d 676, 681–682 (Mo.App.1973). In each case a sale was found and in each case the elements of a traditional sale were present. *Sykes* [l.c. 388] instructed that *sell* meant 'the acceptance of payment for and delivery of an article at a fixed price to be paid for the article.' That instruction was not challenged and was not an element of decision but was shown in the opinion, no doubt, to demonstrate the strength of the evidence for conviction. It submitted, in any event, the actual proof, but does not mean what the defendant makes of it here—that no proof short of a performed commercial sale falls within the criminal sanction of § 195.020. *Lemon* follows *Sykes* to decide that when the elements of a commercial

sale are shown—agreed price, delivery and payment—a *sale* under the criminal statute is also made out. They give no intimation that a transfer of a controlled substance, less formal or other than a commercial sale, cannot convict under the statute. The precedents follow the clear terms of the statutory definition that a *sale* includes *barter* [*State v. McClure*, 504 S.W.2d 664, 667[3](Mo.App.1974)]—which is sufficiently proved by mere participation in the determination of the price to be charged for the controlled substance—and also *exchange* [*State v. Davis*, 450 S.W.2d 168, 170[2–4] (Mo. 1970)] *gift* and even *offer*. The declaration of § 195.020 that possession, sale, distribution or transfer of stimulant drugs shall be unlawful intends that *sale* shall be given an application unconfined by definitions of the civil practice on commerce and contracts. *State v. Schlagel*, 490 S.W.2d 81, 84 (Mo.1973); *State v. Davis*, supra, l.c. 170[2–4]."

 Defendant's conduct in this case fell within the statute prohibiting the sale of a controlled substance and the fact that the purchase price agreed upon was not handed over by the undercover agents does not alter the situation.[1]

The judgment is affirmed.

FLANIGAN, C. J., and MAUS, GREENE and PREWITT, JJ., concur.

---

1. The definition of a narcotics "sale", as expressed in § 195.010(30), is based on the Uniform Narcotics Act. States having similar drug laws have held there was a "sale" even though no consideration passed to the defendant. *People v. Robinson*, 14 Ill.2d 325, 153 N.E.2d 65 (1958); *People v. Jordan*, 5 Ill.App.3d 7, 282 N.E.2d 530 (1972); *Delgado v. State*, 229 So.2d 651 (Fla.App.1969); *State v. Espinosa*, 101 Ariz. 474, 421 P.2d 322 (1966); *State v. Woods*, 214 Kan. 739, 522 P.2d 967 (1974); *State v. Stone*, 114 N.H. 114, 316 A.2d 196 (1974).