STATE of Missouri, Respondent,

v.

Patrick Murray KEATING, Appellant.

No. 59437.

Supreme Court of Missouri,
En Banc.

May 10, 1977.

Rehearing Denied June 14, 1977.

Lee Nation, Asst. Public Defender, Kansas City, for appellant.

James S. Haines, Jr., Asst. Atty. Gen., Jefferson City, for respondent.

MORGAN, Judge.

Respondent's application to transfer this cause from the Kansas City District of the Court of Appeals having been sustained, we consider the same "as on original appeal." Mo.Const. Art. 5, Sec. 10.

Appellant, a lawyer, was indicted and convicted of possession of Phenmetrazine Hydrochloride, a Schedule II controlled substance, and his punishment was fixed by the jury at five years confinement. §§ 195.017, 195.020 and 195.200, RSMo Supp. 1973. We affirm.

Prior to the alleged offense, several law enforcement officers had been assigned to investigate drug traffic into the jail of Jackson County. Officer Charles Williams knew that one Sharon Pollard (hereinafter referred to as the informant) was incarcerated at a Municipal Correctional Institution and he visited her there during May of 1973. On this occasion, they discussed "criminal activities in this town" and "Mr. Keating"; and, she "suggested to [Williams] that Pat Keating might be involved" with drugs being brought into the jail. The officer gave her "a hundred-dollar bill" even though she made no firm commitment to provide information. Upon being released, informant contacted Officer Williams with information, presumably about both appellant and the drug problem. Later she met with the officer at his office in the Jackson County Courthouse where plans were made for informant to pass drugs to appellant on June 21. To avoid some repetition, we detail such "plans" as they were revealed at trial.

Officer Williams was aware that informant had "sources" from which to obtain controlled substances. During the afternoon of June 20, James Lyons, an investigator for the prosecutor's office, chauffeured informant to the offices of two "doctors" in the metropolitan area of Kansas City where she obtained two prescriptions for the controlled substance which appellant was convicted of possessing. Investigator Lyons accompanied informant as far as the waiting room of each doctor's office and paid for the prescriptions she obtained. He then took informant to the Nigro Building in Kansas City where they met Officer Williams at approximately 5:00 P.M. There,

according to informant, she telephoned appellant and told him she "had been able to arrange to obtain some drugs that [they] had discussed previously." She testified that a meeting between the two that night was discussed, but since the two prescriptions had not been filled she advised appellant she would have to call him back to set a definite time and place for them to meet. She further testified that she called appellant later and arranged to meet him the following morning (June 21, 1973) around 8:00 or 8:30 on the ninth floor of the county courthouse. Officer Williams gave her thirty or thirty-five dollars to be used in filling the prescriptions. Stops by informant at several pharmacies produced sixty pills, six of which she kept and took that night.

The next morning, Officer Williams had Harl Morris, a detective on the Jackson County Sheriff's Patrol, go after informant and bring her to the prosecutor's office. She arrived between 7:00 and 7:30 A.M. and had with her the remaining 54 pills. They were in a "plastic container" inside a "white sack" [1] that had come from one of the pharmacies. An effort was made "to wire Miss Pollard [informant] for sound so we could overhear the conversation she was going to have with Mr. Keating." The "monitoring device" to accomplish this hoped for result would not work so Investigator Lyons was selected to go to the ninth floor to "witness the pass." When informant stepped off the elevator on the ninth floor she observed appellant standing by the south corridor window. When she walked over to him, according to informant's testimony, appellant asked her if "she had the pills" and she replied that she did. The "white sack" was handed to appellant and he placed it in his left inside coat pocket. Informant also testified that she asked appellant for directions to "get on the freeway" to go to Kansas City, Kansas, and that he pointed out the route through the window. She then left.

---

1. The sack was admitted in evidence as State's Exhibit No. 2 and we observe that it is 10 inches in length and 9 inches in circumference. Thereon, in dark red, is printed: SHALINSKY, Rexall, Drug Store(s) (with a decorative circle around the same) and Professional Prescription Service followed by addresses and phone numbers.

Investigator Lyons, on the ninth floor to "witness the pass," confirmed the events just described except the conversation, if any, had between informant and appellant. When he, Lyons, observed appellant leaving the ninth floor by means of the "jail elevator," he called the prosecutor's office that the "pass had been made," and he went to the jail area of the courthouse on the twelfth floor. Soon after appellant's arrival at the jail, he was apprehended by Lyons and other "corrections officers." The sack with pills in it was taken from appellant.

Appellant took the stand to testify on his own behalf. He contradicted informant's version of the "meeting" between the two on the ninth floor. He testified that he agreed to meet informant on the morning of June 21 to counsel with her about obtaining a bond with reference to a criminal charge pending against her in Kansas. He told the jury that he believed that the "white sack" passed to him contained money in payment of a fee for legal services he had rendered previously for informant; and, that when he left the "meeting" he proceeded to the jail for a purpose totally unrelated to that claimed by the state.

The record reflects, further, that informant was a user of "various drugs," including Heroin, "off and on" for a period of twenty years, and an "informer" throughout the course of ten years, on more occasions than she could count or remember, for the offices of the United States Attorney, Jackson County Sheriff, Jackson County Prosecutor and the Kansas City Police Department. Not unexpectedly, her credibility was attacked vigorously by defense counsel throughout the trial and the record is replete with evidence of her prior criminal convictions and efforts to establish that her testimony was fabricated in return for favorable "arrangements" reference other charges.

Prior to trial, a separate hearing had been held on appellant's Motion To Suppress the controlled substance. Informant, as a witness, was available to testify as to appellant's "predisposition" to commit the crime—a relevant and necessary issue un-

der the subjective test. For instance, in response to one question she said: "Well, we discussed the prior times I'd given Mr. Keating pills to take into the County Jail." The following dialogue occurred with informant as a witness:

Q—Now, you say that you obtained the pills for Mr. Keating prior to June the 20th?

A—Yes, I did.

Q—Can you tell us what dates they were prior to June the 20th?

A—No, I don't know the exact dates.

Q—Did you report this to any law enforcement agency?

A—No, I didn't.

Q—Did you ever tell Mr. Williams about it?

A—Yes.

Thus, it is readily apparent that the state was prepared, if entrapment was raised at trial, to assume its burden of showing beyond a reasonable doubt (under the subjective test) that appellant was predisposed. Defense counsel, being not only aware of the law but also the state of the evidence, as an apparent trial strategy took a very ambivalent approach to his problem—the result being that some statements made during trial are totally inconsistent with some of the arguments made on appeal. Three comments of defense counsel to the trial court should suffice:

Your honor, I can state specifically what I'm concerned about. And that is getting into information—alleged information which—about other alleged drug activities supposedly connected with Mr. Keating. I believe that would be beyond the bounds  .  .  .

Judge, during the last break, a comment Mr. O'Sullivan (Prosecutor) made to me makes me think there may be some misunderstanding as to the nature of the defense in this case, specifically as to whether or not entrapment in the sense usually used is relied on in this case. *It is not.* (Emphasis added.)

This type of entrapment is not the case here . . . As I've stated, it's the defense position that Sharon Pollard has, in effect, framed Pat Keating. That he had no knowledge that he possessed narcotics. That he had no intent to possess narcotics . . . this is a factual defense, obviously.[2]

In his original brief filed in the Court of Appeals, appellant contended that the trial court erred (1) "in overruling appellant's [motion for] judgment of acquittal as entrapment exists as a matter of law whenever the state provides the contraband upon which a possessory offense is based"; (2) "in failing to view documents subpoenaed by appellant after attorney-client privilege was claimed"; (3) "in failing to grant appellant a new trial on the grounds that the prosecution failed to disclose its agreement or understanding with witness Sharon Pollard"; (4) "in improperly limiting the cross-examination of prosecution witness Sharon Pollard"; and, (5) "by excluding evidence tending to show an agreement between the prosecution and witness Sharon Pollard."

In his supplemental brief filed in this court, appellant expands the point on entrapment by contending that: "*A* —entrapment was interjected into appellant's trial; no predisposition was shown by the prosecution; thus, entrapment was established as a matter of law; *B* —the trial court erred in failing to instruct on entrapment as entrapment was part of the law of the case; *C* —Missouri's entrapment defense should be modified similar to the test employed in *United States v. Mosley*, 496 F.2d 1012 (5th Cir. 1974); and *D* —this court should establish the objective entrapment test."

First, we consider the point on entrapment and hasten to add that there can be no doubt as to the law in this state. Missouri follows the "subjective" test which focuses on the "origin of intent" to commit the crime with emphasis on the "predisposi-tion" of the accused in contrast to the "objective" test which concentrates on whether or not the police activity shown should be condoned or rejected.

This court in *State v. Decker*, 321 Mo. 1163, 14 S.W.2d 617 (1929) at 619 said: "The rules applicable may be stated thus: Where the criminal intent originates in the mind of the defendant on trial, and the offense is accomplished, it constitutes no defense that an opportunity is furnished, or that an officer aids the accused in the commission of the crime, in order to obtain evidence upon which to prosecute him. But where the criminal intent originates in the mind of the entrapper, and the accused is lured into the commission of the offense charged, in order to prosecute him therefor, it is the general rule that no conviction may be had, though the criminality of the act is not affected by any question of consent."

Recently, this court in *State v. Hammond*, 447 S.W.2d 253 (Mo.1969), reaffirmed the holding in *Decker* and approved an instruction (l.c. 254–255) premised on the subjective test. We need only quote the last two paragraphs of said instruction to give a concise example of how the test is articulated in this state, to-wit:

"If, then, the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit crimes such as charged in the Information, whenever opportunity was offered, and that the Government agents did no more than offer the opportunity, the defendant is not entitled to the defense of unlawful entrapment.

On the other hand, if the jury should find from the evidence in the case that the defendant had no previous intent or purpose to commit any offense of the character here charged, and did so only because

---

2. Defendant's theory as thus expressed was exactly that submitted to the jury in Instructions 5 and 6. No. 5 required the jury for conviction to find "that defendant was aware of the character of the drug and intentionally and knowingly had it in his possession" while

No. 6 provided that: "If you do not find and believe from the evidence beyond a reasonable doubt that defendant was aware of the nature of the drug and knowingly had it in his possession, you must find the defendant not guilty."

he was induced or persuaded by some agent of the Government, then the defense of unlawful entrapment is a good defense, and the jury should acquit the defendant."

Compare MAI–CR 3.28.

Our holdings reference entrapment as a defense are consistent with those of the United States Supreme Court. Representative state cases include: *State v. Varnon*, 174 S.W.2d 146 (Mo.1943); *State v. Taylor*, 375 S.W.2d 58 (Mo.1964); *State v. Van Regenmorter*, 465 S.W.2d 613 (Mo.1971); *State v. Sledge*, 471 S.W.2d 256 (Mo.1971); *State v. Stock*, 463 S.W.2d 889 (Mo.1971); *State v. Golightly*, 495 S.W.2d 746 (Mo.App.1973); *State v. Sykes*, 478 S.W.2d 387 (Mo.1972); *State v. Boxley*, 497 S.W.2d 129 (Mo.1973); *State v. Pearson*, 519 S.W.2d 354 (Mo.App. 1975); and *State v. Hyde*, 532 S.W.2d 212 (Mo.App.1975). Of interest is a Comment, *Entrapment: A Critical Discussion*, in Volume 37, No. 4 (Fall 1972), Missouri Law Review at 633, wherein many of the cases just cited are discussed. The author of the comment, contrary to the decisions of this court, finds the "objective" test attractive.

■ First, it must be determined if "entrapment" is a viable issue in this case. We think it obvious that it is not. Where was there a possibility of illegal "inducement" of appellant to commit the offense? Police activity of which he was unaware would not be relevant as it could not have affected his activities in any manner. Thus, the only possible inducing factor left would be the two phone calls informant made to appellant; and, he eliminated any chance they tended to induce him to take drugs into the jail by testifying that such phone conversations involved subject matter other than drugs. Nothing else is left; and, it was not necessary that the defense of entrapment be submitted to the jury. *State v. Taylor*, supra. However, if entrapment evidence had been present, it would have been incumbent upon the court to instruct on the issue whether requested or not. *State v. Decker*, supra, 14 S.W.2d at 620.

This case is much like that of *State v. Napolis*, 436 S.W.2d 645 (Mo.1969) wherein the court discussed comparable facts and the holding in *Kibby v. United States*, 372 F.2d 598 (8th Cir. 1967); and, then ruled (l.c. 649) that: " . . . the only evidence which possibly could pertain to the issue of entrapment was that the agent Rutledge and the informer Ivy went to an apartment building where they asked to see Chico, the defendant, and when they saw him merely told him that Ivy's companion wanted to buy some 'splash.' This evidence is comparable to the evidence of the telephone call in *Kibby* and is insufficient to warrant consideration of the issue of entrapment or to justify an instruction to the jury on that issue."

Appellant's defense was much like that in *State v. McIntosh*, 333 S.W.2d 51 (Mo.1960), wherein it was said at 60: "Her theory and testimony was that she had not sold narcotic tablets as alleged in the amended information. Her tendered instruction, the refusal of which is assigned as error, was not based on the theory of entrapment. It was based on the theory that she was innocent of the charge against her; that the evidence had been 'planted' and defendant 'framed' by false testimony . . . The instruction was properly refused . . . " As heretofore shown, the instructions given (Nos. 5 and 6) submitted this very issue (deception) and we cannot avoid the fact that by its verdict the jury rejected appellant's version.

Nevertheless, we feel compelled to respond briefly to appellant's other arguments reference entrapment although they fall necessarily into a category of dicta.

■ 1. Originally in the Court of Appeals, the entrapment argument was limited to a contention that an acquittal must always follow when the state provides the contraband. Reliance was placed on *United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971), and *United States v. Mosley*, 496 F.2d 1012 (5th Cir. 1974); both of which, in fact, direct acquittal in such a case and the declaration of such a rule became identified as a "Bueno" Instruction. Appellant recognizes

that the 8th Circuit Court of Appeals rejected a comparable approach in *United States v. Hampton*, 507 F.2d 832 (1974), upon which the United States Supreme Court granted certiorari at 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). We now have the guidance of that opinion—found in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Therein, the court reaffirmed its belief in the fairness of the "subjective" test and rejected all arguments that supplying of contraband by the state barred prosecution. We agree.

2. In his supplemental brief, filed in this court under "A", appellant submits that the state failed to make a submissible case because no "predisposition" of appellant was shown. Since entrapment was not an issue, the point is moot. However, we recognize respondent's argument that: "It strains credulity to say that a manifest injustice can result from the state's failure to adduce predisposition evidence . . . when it is remembered that these failures resulted from the calculated trial strategy of appellant."

3. Point "B" is lacking in merit since it has been found that entrapment was not an issue and no instruction thereon was required.

4. Point "C" recommends our adoption of the finding in *United States v. Mosley*, supra, but we decline since such an approach has been rejected in *United States v. Hammond*, supra.

5. Point "D" recommends that this court reject the "subjective" test and adopt or establish an "objective" test. Conceding as we must that the "subjective" test is not without its problems, we decline to abandon it. "The defense of entrapment was not known at common law. It is not recognized in some states, and some states seem to support the view that the entrapment doctrine is not applicable to certain prosecutions . . . ." 21 Am.Jur.2d, Criminal Law, § 143, p. 212. However, the test

therein is at least directed toward a determination of whether or not the accused was "induced" to commit the crime, while the "objective" test makes no effort to resolve that basic issue and goes off on a tangent to resolve whether or not the state activity was too offensive to tolerate.

The point (with its sub-points) is ruled against appellant.

▮ Next, we consider those points (other than entrapment) presented initially in the Court of Appeals and heretofore listed. Nos. 2, 3 and 5 all revolve around appellant's contention that informant's testimony was fabricated in return for favorable treatment by the state reference her many criminal activities and charges. No. 2 pertains to a subpoena duces tecum seeking examination of the file of Mr. Henri Watson, an Associate Public Defender, who represented informant in some of the charges pending against her. At a hearing thereon, appellant's counsel advised the court that: ". . . counsel does not have the exact nature of the papers in Mr. Watson's file . . . ." but went on to guess what might be found therein and contended the same did not come under the attorney-client privilege, § 491.060, RSMo 1969, as asserted by Mr. Watson.[3] See Rule 25.32 which calls for the state's disclosure to a defendant of most every conceivable bit of information available. It is not necessary for us to balance the dictates of the rule against the duty of Mr. Watson to protect the confidences of his own client, the informant. Even if it be assumed that the trial court erred in sustaining Mr. Watson's position, the ruling could not have been prejudicial to appellant. At the hearing on the motion, Mr. Watson explained events leading to dismissal of the two charges in Kansas. He testified that long before the instant case prosecutors there had agreed to dismiss the same if informant paid the costs. "At that time I received that letter [offering to nolle the same], I had no communications whatsoever with Mr. O'Sullivan or anybody else

---

3. The obvious objective was disclosure of "deals" allegedly made by the state for informant's assistance and the post-trial dismissal

of at least four charges that had been pending against informant or her son.

in the Jackson County Prosecutor's Office with reference to these two charges. In fact, it was not until much later, and that is, after I had learned that Sharon Pollard was a prospective witness for the State in the Keating case, that I had occasion to discuss these charges with Mr. O'Sullivan."

In connection with the dismissal of charges in Missouri, Mr. Joseph Hogsett, trial director of the Jackson County Prosecutor's Office, testified that his dismissal of the charges in the Jackson County Circuit Court against Sharon Pollard and her son was not the result of a deal between the state and Sharon Pollard, but rather, in her case it was the result of an illegally obtained confession. With respect to dismissal of the charge against her son, it was concluded that the charge should not have been filed in the first place. As said in *State v. Sims*, 501 S.W.2d 161 (Mo.1973), l.c. 162: "The difficulty in appellant's position is that his contention does not prove itself, and there is nothing in this record to suggest that the prosecuting attorney had made any promises to or agreements with the witnesses with respect to their future prosecution to disclose to the jury." The promise to arrange an outstate location for informant to finish serving her term was divulged.

Point 2 is lacking in proof and the same necessarily applies to Nos. 3 and 5. See *State v. Collett*, 526 S.W.2d 920 (Mo.App. 1975) reference Point VI, The "Deal", at 930, 931 and 932.

■ In No. 4, appellant contends he was unduly restricted in his cross-examination of informant and therefore the jury was unaware of certain facts which might have discredited her testimony. We adopt, and consider sufficient, the respondent's response wherein a portion of the evidence is summarized, to-wit:

On direct examination Sharon Pollard gave her residence as the Lexington County Jail. On cross-examination Sharon Pollard said that she had been taking drugs for twenty years, that she had been hospitalized in the federal narcotics hospital at Lexington, Kentucky, that she had been in a methadone program administered by the Kansas City University Medical Center, that she had taken a number of drugs, including heroin, that her participation in the methadone program ended with her incarceration at the Municipal Correctional Institution, that during May, 1973, a narcotics charge, a burglary charge, and two forgery charges were pending against her, that she had been married four times, that she had only been employed for a brief period during the preceding eight years and that was while she was in a federal narcotics rehabilitation program, that in the past she had served time in the Municipal Correctional Institution, the Jackson County Jail, and the Missouri Penitentiary for Women, that she once walked away from a hospital in Columbia, Missouri, while she was in the custody of the Missouri Department of Corrections, that she once attempted to escape from the Municipal Correctional Institution, that for ten years she had been an informer for the Kansas City Police Department, the United States Attorney's Office and the Jackson County Prosecutor's Office, that she would not characterize herself as a law-abiding citizen, that during the time she operated as an informant criminal charges pending against her were dismissed, that she had been convicted of one felony and four or five misdemeanors, and that her misdemeanor offenses included carrying a concealed weapon, prostitution, and shoplifting, while the felony offense was forgery.

From the record as made, it cannot be said that a jury of reasonable intelligence did not appreciate informant's reputation; and, accordingly there was no denial of the right of confrontation.

Point No. 4 is ruled against appellant.

Finding no reversible error, the judgment is affirmed.

SEILER, C. J., and BARDGETT, HENLEY, FINCH and DONNELLY, JJ., concur.

RENDLEN, J., not participating because not a member of the Court when cause submitted.