UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael LEJA and John M. Cody,
Defendants-Appellants.

Nos. 76–2657 and 2658.

United States Court of Appeals,
Sixth Circuit.

Argued April 18, 1977.

Decided and Filed Oct. 3, 1977.

F. Randall Karfonta, Gershwin A. Drain, John W. Tapp, Detroit, Mich., Edward C. Wishnow, Bornstein, Wishnow, Shaye & Schneiderman, Southfield, Mich., for defendants-appellants.

James K. Robinson, U. S. Atty., Ronald W. Mellish, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, ENGEL, Circuit Judge, and RUBIN, District Judge.*

PER CURIAM.

Michael Leja and John M. Cody appeal from convictions of manufacturing and pos-

* The Honorable Carl B. Rubin, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

sessing with intent to distribute phencyclidine (PCP), a Schedule III controlled substance, in violation of 21 U.S.C. § 841(a)(1).

There is little dispute as to the facts. In November of 1975, Leja approached one Theodore Sawicki with a proposal to produce phencyclidine in a laboratory. Leja, Cody, and Sawicki thereupon entered into a three-way partnership. All agreed that Cody would supply glassware and money; Sawicki would obtain the necessary chemicals; and Leja would provide the technical expertise. Unknown to Cody and Leja, Sawicki was an informant for the Drug Enforcement Administration (DEA), and his participation in the phencyclidine laboratory was known to and approved by that agency.

The laboratory was established in Sawicki's home and phencyclidine was produced in May of 1976. Pursuant to Sawicki's agreement to obtain chemicals, other agents of the Drug Enforcement Administration provided phenyl magnesium bromide, cyclohexanone, piperidine, and some quantity of ether. While the sellers of some of these precursor substances must report sales to the DEA, all are legally obtainable.

During the production of phencyclidine, the Drug Enforcement Administration placed the laboratory under the surveillance of Thomas Janovsky, a laboratory analyst of the DEA, ostensibly to insure that no explosion or other side effect from the chemical reaction could take place. However, the activities of Mr. Janovsky went beyond this stated purpose. The record indicates that he gave some technical instructions concerning the manufacturing process of phencyclidine when defendant Leja encountered difficulties.[1]

On appeal defendants Leja and Cody contend that the government's involvement in the entire illicit operation was so excessive as to violate due process as a matter of law or to warrant reversal under our supervisory jurisdiction over the judicial system. Defendants do not raise the traditional entrapment defense, as it is undisputed that they had the predisposition to commit the criminal acts.[2]

■ The Supreme Court has consistently viewed entrapment as an implied statutory defense, based on an assumption that "Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations." *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958). Thus the focus has been on the accused's predisposition, rather than on the nature of the government conduct. As long as the defendant exhibits a predisposition to commit an offense, the governmental participation in the commission of an offense by itself cannot be the basis of an entrapment defense. *Hampton v. United States*, 425 U.S.

---

1. Q. What about the informant [Sawicki]? Was he discussing it with you also what was happening in the house?
   A. Yes, sir.
   Q. They were telling you the procedures that were occurring. Is that also correct?
   A. Yes, sir.
   Q. And did they also tell you that they were having problems, is that correct?
   A. Yes, sir.
   Q. And did they ask you for advice with respect to those problems?
   A. They asked me what he was doing wrong. They didn't ask for specific advice. They said was he—apparently something had gone wrong towards the end.
   Q. Okay.
   A. They told me what he did and they asked me, what did he do wrong.
   Q. Did they ask you what he should do or what he should be doing?
   A. Possibly. I don't remember any definite answer; *yes, it could have happened.*
   Q. And if they asked you that, you told them, is that correct?
   A. *I told them what I knew, yes.*
   Q. Okay. Now, on approximately how many occasions would that have occurred, more than once in terms of things going wrong and their telling you about it?
   A. I would say probably there was two times that I recall for sure.
   (emphasis added)
   Cody Appendix, pages 16–17.

2. Defendant Leja did raise the entrapment defense at trial, but conceded at oral argument that he did in fact have the necessary predisposition. Defendant Cody expressly chose not to raise the entrapment defense at trial.

484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

The defendants rely, however, upon the view of five justices in *Hampton v. United States, supra,* indicating that overinvolvement of government agents in criminal offenses might be so egregious as to violate due process or to warrant reversal under the court's supervisory powers.[3] Justice Rehnquist, speaking for a plurality, stated that due process would not be offended by such conduct and it would never be appropriate to use supervisory powers in such situations. While Justice Powell and Justice Blackmun concurred in the judgment, they declined to join in a *per se* rule. Significantly, Justice Powell observed:

> The plurality thus says that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant regardless of the outrageousness of police behavior in light of the surrounding circumstances.

> I do not understand *Russell* or earlier cases delineating the predisposition-focused defense of entrapment to have gone so far and there was no need for them to do so.

> .    .    .    .    .

> [W]e left these questions open in *Russell,* and this case is controlled completely by *Russell.* I therefore am unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in

any case where the Government is able to prove predisposition.

425 U.S. at 492–93, 495, 96 S.Ct. at 1651, 1652.[4]

Justice Brennan, in a dissent joined by Justices Stewart and Marshall, agreed that *Russell* did not foreclose imposition of a bar to conviction based on the court's supervisory power or on due process principles where the government conduct was sufficiently offensive. He contended that the conduct in *Hampton* was sufficiently egregious to require a reversal under the court's supervisory powers while leaving to another day whether or not due process should require the same result. 425 U.S. at 500 n. 4, 96 S.Ct. 1646. Specifically he noted that the government had supplied the actual contraband which the defendant sold, rather than an ingredient that could be legally possessed. And, the government did not step into an ongoing operation, but rather was involved from the beginning to the end. The sales for which the defendant was convicted were allegedly instigated by government agents and completed by the purchases of government agents.

▐ In the light of *Hampton,* therefore, we conceive the issue to be whether the governmental activity described above so offends our concepts of fundamental fairness as to justify the extraordinary employment of judicial power to curb it. We cannot affirmatively approve of the government's activity in this case. Indeed, we share the view of Judge Friendly in *United States v. Archer,* 486 F.2d 670, 676 (2d Cir. 1973), that "there is certainly a limit in allowing governmental involvement in crime." Our guardianship of constitutional principles, however, is not measured by personal distaste.

> I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement.
> 425 U.S. at 495 n. 7, 96 S.Ct. at 1652.

---

**3.** In *Hampton* there was no majority opinion. A plurality of Justices Rehnquist, White and Chief Justice Burger affirmed the conviction. Justices Powell and Blackmun concurred. Justices Brennan, Stewart and Marshall dissented. Justice Stevens did not participate.

**4.** Such an alternative defense would rarely, if ever, be available, Justice Powell noted:

■ As a general proposition, police and law enforcement conduct at the investigative stage is most properly supervised by the executive branch or by the passage of laws by the Congress. The courts have limited their involvement to violations of constitutional proportions. Thus, in *United States v. Russell, supra,* entrapment was specifically held not to be a constitutional defense. 411 U.S. at 430, 93 S.Ct. 1637. If the egregious conduct of implanting an unlawful motive in an innocent mind does not rise to constitutional magnitude, it is difficult indeed to prohibit on constitutional grounds the prosecution of the defendants on these facts, where they were clearly predisposed to commit the acts.

■ Turning to the question of whether reversal can be premised upon the supervisory powers of the court, we observe that the traditional area for exercising these powers has been within the framework of judicial proceedings. Thus, we have reversed convictions for prosecutorial misconduct in the course of trials, *see, e. g., United States v. Wiley,* 534 F.2d 659, 661 (6th Cir.), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 819 (1976), without limiting ourselves to the acknowledged, narrower constitutional standards. *See Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). It is quite another matter, however, to extend the court's supervisory power to areas outside this traditional domain of the court. To do so here, where the government conduct does not offend a personal right of any defendant, would be directly "to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve." *United States v. Russell, supra,* 411 U.S. at 435, 93 S.Ct. at 1644. Like Judge Friendly in *United States v. Archer, supra,* and like Justice Powell in *Hampton, supra,* we determine never to say "never" as long as the potential for abuse of individual rights exists in governmental action. A proper respect for the coequal responsibilities of the other branches of government under the Constitution and for the system of checks and balances, however, persuades us to refrain from acting here. This is particularly so where, as here, no precise violation of any penal statute by the officers in question is shown and where it seems certain that the defendants could have obtained sources of supply and information without the assistance of the government agents, given their established predisposition to go into the drug making business.

Affirmed.

CARL B. RUBIN, District Judge (dissenting).

I must respectfully dissent. While I do agree that the question is "whether the governmental activity described above so offends our concepts of fundamental fairness as to justify the extraordinary employment of judicial power to curb it,"[1] I do not agree with the majority's answer thereto.

It is clear from the concurrence and dissent in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), that a majority of the Justices of the Supreme Court recognize that there may be a level of egregious governmental participation in criminal activity that is proscribed, no matter how worthy the objective or how deceitful the adversary.

It is equally clear that were we dealing here only with the supplying of phenyl magnesium bromide, or some other chemical, that level would not have been exceeded. *Hampton,* 425 U.S. at 491–492, 96 S.Ct. 1646 (Powell, J., concurring).

This, however, was not the limit of governmental participation in appellants' manufacture of phencyclidine. The DEA supplied not only the ingredients, but also the laboratory site, and most important: technical knowledge without which the phencyclidine could not have been produced.

Whatever else egregious conduct may be, it is at least the instruction by law enforcement officers in the technical expertise necessary for the commission of a crime. Such conduct is sufficiently violative of the concept of "fundamental fairness" as to be a denial of due process. *Kinsella v. United*

*States, ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960).

By its very nature, "due process" is not a calibrated standard. As the Supreme Court noted in *United States v. Russell,* 411 U.S. at 431, 93 S.Ct. at 1642, there are ". . . difficulties attending the notion that due process of law can be embodied in fixed rules, . . . ."

The activities of the United States should be tested against the statement of Justice Frankfurter writing for the Court in *Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952), that:

> Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardoza twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', *Snyder v. Massachusetts,* 291 U.S. 97, 105, [54 S.Ct. 330, 332, 78 L.Ed. 674], or are 'implicit in the concept of ordered liberty'. *Palko v. Connecticut,* 302 U.S. 319, 325, [58 S.Ct. 149, 152, 82 L.Ed. 288].

I believe that in this case and under these circumstances the activities of the United States violated due process of law as above defined.

I would reverse the convictions of Michael Leja and John Cody.