STATE of Missouri,
Plaintiff-Respondent,

v.

David Elmer HOHENSEE,
Defendant-Appellant.

No. 12407.

Missouri Court of Appeals,
Southern District,
Division One.

July 20, 1982.

Motion for Rehearing or Transfer Denied
August 10, 1982.

Application for Transfer Sustained
Sept. 14, 1982.

Cause Retransferred as Improvidently
Transferred Jan. 24, 1983.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Judge.

The break-in at the Brandhorst building was not of the run-of-the-mill variety. Not that George Bressie and Jimmy Yarberry, who effected the illegal entry, were strangers to crime. Indeed Bressie had ten felony convictions, most of them for burglary, and admittedly had committed six other burglaries for which he had not been convicted. Yarberry, too, had a substantial criminal record. At the time of the Brandhorst break-in both of them were "out on bond" awaiting trial for yet another burglary. The peculiar thing was that the Springfield Police Department was paying the two men to commit the break-in, and this without the consent [1] or even knowledge of the

1. Sec. 569.170, par. 1, reads: "A person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein."

building owner. When the two men removed the safe from the building, Officer Reginald Roberts of the Springfield Police Department helped them load it onto a truck. Sitting in his vehicle ½ block away, and acting as lookout for the other three men, was the defendant Hohensee. He was the only member of the quartet who did not know that the joint venture was being conducted under police sponsorship. Defendant's state of mind was solely criminal. Of the group, defendant alone was charged with burglary of the Brandhorst building.

A jury found defendant Hohensee guilty of second degree burglary, § 569.170, and conspiracy, § 564.016, and the trial court, finding defendant was a persistent offender, § 558.016, imposed consecutive sentences of ten years for the burglary and eight years for the conspiracy. Defendant appeals.

Defendant's first point attacks the validity of the burglary conviction on the ground that it was obtained in violation of "defendant's right to due process of law in that the evidence upon which that conviction rested was obtained by means of illegal and outrageous conduct on the part of law enforcement officers and their agents."

Count I of the information, on which the burglary conviction was based, charged that the defendant on July 31, 1980, "knowingly entered unlawfully in a building located at 1407 North Cedarbrook, Springfield, Missouri, and possessed by Brandhorst Battery Company, for the purpose of committing stealing therein."

The state's evidence showed that at approximately 11:00 p.m. on July 30, defendant and three other men, Bressie, Yarberry, and Roberts, were at a house located on Missouri Street in Springfield. Unknown to defendant were these facts: Roberts was a police officer; Bressie and Yarberry a couple of weeks earlier had made a "deal" with the police whereby Bressie and Yarberry, in return for leniency on another burglary charge, would supply information to the police concerning "illegal acts" and "what was going on in Springfield and who was stealing what"; pursuant to the "deal" Yarberry and Bressie were being paid weekly salaries by the police department and were working closely with Officer Roberts; a hidden movie camera and sound equipment had previously been installed in the house by Bressie and Roberts with the help of television studio personnel; the actions and conversations at the undercover house were being photographed and recorded by a concealed cameraman.

Defendant had been acquainted with Bressie since 1973. Neither was a stranger to the law. Defendant had three prior burglary convictions, the most recent in 1971. Over the years burglary was their principal topic of conversation.

During the late night conference on July 30, defendant and the other three men discussed burglarizing the Brandhorst building. Defendant was familiar with the interior of the building because he had purchased a battery there several months before. For the use of his companions, defendant drew a floor plan of the building, which included the location of a safe. Using separate vehicles, the four men proceeded to the target area shortly after midnight. Defendant drove his own vehicle and parked it in a parking lot approximately 150 yards from the Brandhorst building. He was to remain there as a lookout while his companions made the illegal entry. The other three men were in "an old Ford van." This trio proceeded to the Brandhorst building. There Yarberry and Bressie pried open the front door, entered the building, and removed the safe. Officer Roberts helped these two men load the safe into the van. The trio then drove past the lookout position of the defendant, who followed them to the undercover house. There the defendant, in the company of the others and in view of the hidden camera, opened

Sec. 569.010 reads, in pertinent part: "As used in this chapter the following terms mean: . . . (8) 'Enter unlawfully or remain unlawfully,' a person 'enters unlawfully or remains unlaw-

fully' in or upon premises when he is not licensed or privileged to do so."

Unless otherwise indicated, all references to statutes are to RSMo 1978, V.A.M.S.

the safe. The "swag" proved disappointing —"$6.00 and some change."

The Brandhorst break-in was only part of an undercover operation which the Springfield Police Department called "Operation Rosebud." Defendant was not arrested until some time after mid-September. The state's evidence showed that Officer Roberts' participation in the Brandhorst break-in, and Operation Rosebud generally, were authorized and approved by Roberts' superiors in the Springfield Police Department and that, in the middle of July, Officer Roberts met with "the Detective Division and supervisor" and also attended "a meeting with the prosecutor's office, with the prosecuting attorney present." Thereafter the undercover house was rented and Operation Rosebud commenced.

Defendant makes no claim of "entrapment" and indeed, in the trial court, his counsel expressly disavowed that defense.[2]

On the Due Process Clause of the Fourteenth Amendment defendant bases his claim that his burglary conviction is vitiated by the "outrageous conduct" of the law enforcement personnel and their two salaried felons, Bressie and Yarberry.

In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), the Court made this statement: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . ., the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment."[3]

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), eight members of the Court dealt with a situation where the defendant claimed denial of due process based upon conduct of government agents which was allegedly "outrageous." In *Hampton* a government informant supplied heroin to the defendant who in turn sold it to government agents. Defendant was convicted of distributing heroin in violation of a federal statute.

A plurality opinion by Mr. Justice Rehnquist (in which the Chief Justice and Mr. Justice White joined) affirmed the conviction. That opinion pointed out that "en-

---

**2.** Where the defendant is "predisposed" to commit the offense, entrapment, under the "subjective test" which Missouri follows, is not available to him. See *State v. Keating,* 551 S.W.2d 589, 592 (Mo. banc 1977), based on statutory predecessors to § 562.066, par. 2, which defines "entrapment." Under that statute the issue of entrapment is not available to the defendant unless, among other things, "he was not ready and willing to engage in such conduct."

Federal authorities adopting the "subjective" approach to entrapment, which approach focuses on the predisposition of the defendant, as distinguished from the "objective" approach, which focuses on the conduct of the government agents, include *United States v. Bagnariol,* 665 F.2d 877 (9th Cir.1981); *United States v. Tobias,* 662 F.2d 381 (5th Cir.1981); and *United States v. Webster,* 649 F.2d 346 (5th Cir.1981). For a discussion of the "subjective" and "objective" approaches see *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 1647, 36 L.Ed.2d 366 (1973) (dissenting opinion of Mr. Justice Stewart).

**3.** "No person . . . shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const., Amend. V.

"... nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." U.S. Const., Amend. XIV, Sec. 2."

"That no person shall be deprived of life, liberty, or property, without due process of law." Mo. Const., Art. I, § 10."

"The guaranty of due process of law which is stated in the Fifth Amendment binds the federal government, while that stated in the Fourteenth Amendment binds the states; and the restraint imposed upon legislation by the due process clause of the Fifth and Fourteenth Amendments is the same. Thus, the limitations inherent in the requirements as to due process of law are binding equally on the United States and on the several states." 16A Am.Jur.2d Const. Law § 821, p. 1000.

The state does not deny that the action of the Springfield Police Department was "state action" as contemplated by the Fourteenth Amendment. See, generally, 16A Am.Jur.2d Const. Law § 822, p. 1001; 16A C.J.S. Const. Law § 568(e), p. 555.

trapment" was not involved because the predisposition of the defendant to commit the crime was established. Further, said that opinion, "The remedy of the criminal defendant with respect to the acts of Government agents, which, far from being resisted, are encouraged by him, lies solely in the defense of entrapment.... The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant.* Here, as we have noted, the police, the Government informant, and the defendant acted in concert with one another. If the result of the governmental activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission...,' *Sorrells* [*v. United States,* supra, 287 U.S. [435], at 442, 53 S.Ct. [210], at 212, 77 L.Ed. [413], at 417, the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." (Emphasis in original.) 96 S.Ct. 1.c. 1650.

Concurring in the judgment, Mr. Justice Powell, with whom Mr. Justice Blackmun joined, said, "I therefore am unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition." Mr. Justice Powell added

this statement: "I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction."

A dissenting opinion by Mr. Justice Brennan (in which Stewart and Marshall, JJ. concurred) said: "I agree with Mr. Justice POWELL that *Russell* does not foreclose imposition of a bar to conviction—based upon our supervisory power or due process principles—where the conduct of law enforcement authorities is sufficiently offensive, even though the individuals entitled to invoke such a defense might be 'predisposed.' Ante, [96 S.Ct.] at 1652. In my view, the police activity in this case was beyond permissible limits." Brennan, J. also expressed the view that an entrapped defendant should not be convicted if the methods employed on the government's behalf should not be countenanced, regardless of the predisposition of the defendant.

In the wake of *Hampton* there is substantial federal authority for the proposition that government overinvolvement, if "outrageous," will bar prosecution of a defendant on the ground of deprivation of due process even if he is "predisposed." *United States v. Bagnariol,* 665 F.2d 877 (9th Cir. 1981); *United States v. Fekri,* 650 F.2d 1044 (9th Cir.1981); *United States v. Wylie,* 625 F.2d 1371 (9th Cir.1980); *United States v. Borum,* 584 F.2d 424 (D.C.Cir.1978); *United States v. Prairie,* 572 F.2d 1316 (9th Cir. 1978); and *United States v. Leja,* 563 F.2d 244 (6th Cir.1977).[4]

4. Cases recognizing the principle, but finding it inapplicable in the specific factual context, include *United States v. Bagnariol,* 665 F.2d 877 (9th Cir.1981) (government's activity in creating fictitious corporation with undercover agents who participated with defendant in scheme to bring about legalization of gambling in the state of Washington did not deprive defendant of due process); *United States v. Gray,* 626 F.2d 494 (5th Cir.1980) (two government agents suggested a smuggling scheme to defendants and provided them with repair services, an air strip and a crew—government's conduct not so outrageous as to deny due process); *United States v. Fekri,* 650 F.2d 1044 (9th

Cir.1981) (defendant, convicted of offering a cash rebate on Medicare collections, not denied due process where government's involvement "amounted to no more than setting up an atmosphere in which defendant would feel comfortable in discussing an illegal act"); *United States v. Wylie,* 625 F.2d 1371 (9th Cir.1980) (agent's suggestion of form of payment in LSD not violative of due process); *United States v. Leja,* 563 F.2d 244 (6th Cir.1977) (government informant provided defendant with chemicals and technical instructions necessary to produce a controlled substance—no denial of due process because agents neither solicited defendant nor provided him with materials and information

■ The issue of whether the specific governmental conduct involved was "outrageous" is one of law for the court and is not one of fact for the jury. *United States v. Wylie,* 625 F.2d 1371 (9th Cir.1980); *United States v. Lentz,* 624 F.2d 1280 (5th Cir. 1980); *United States v. Nunez-Rios,* 622 F.2d 1093 (2d Cir.1980); *United States v. McQuin,* 612 F.2d 1193 (9th Cir.1980); *United States v. Johnson,* 565 F.2d 179 (1st Cir.1977).

The principal post-*Hampton* federal case upholding a due process defense based on police overinvolvement is *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978). There two defendants, Twigg and Neville, were convicted of the illegal manufacture of a controlled substance. Government agents approached Neville, who was not then engaged in any illicit drug activities and, said the court, "deceptively implanted the criminal design in Neville's mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and [the government informant] encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him, when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." *Twigg,* l.c. 381. Twigg's conviction was also reversed for his involvement was less than that of Neville.[5]

In *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981), the court discussed federal cases where the defense claimed that government involvement was so outrageous as to deny due process. The court there said: "The cases demonstrate that outrageous involvement turns upon the totality of the circumstances with no single factor controlling." The United States Court of Appeals for the Sixth Circuit[6] and the

not otherwise available); *United States v. Sanford,* 547 F.2d 1085 (9th Cir.1976) (federal agent's violation of state game laws in course of undercover investigation not outrageous; analogous to supplying contraband to ongoing criminal enterprise); *United States v. Spivey,* 508 F.2d 146 (10th Cir.1975) (no due process violation when informant gave defendant food and lodging and unlawfully supplied him with marijuana; insufficient nexus between informant's unlawful conduct and defendant's subsequent sale of heroin to government agents).

5. Based on *Twigg,* a lower federal court acquitted two persons of the "Abscam" undercover operation involving bribery of a public official. *United States v. Jannotti,* 501 F.Supp. 1182 (E.D.Pa.1980). Compare, however, another Abscam case, *United States v. Myers,* 527 F.Supp. 1206 (E.D.N.Y.1981), where the court found no due process violation.

For pre-*Hampton* cases recognizing a due process defense based on excessive police involvement see *Greene v. United States,* 454 F.2d 783 (9th Cir.1971), and the dictum in *United States v. Archer,* 486 F.2d 670, 674–677 (2d Cir.1973). There Judge Friendly said: "[T]here is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality."

6. In *United States v. Brown,* 635 F.2d 1207 (6th Cir.1980), the court listed the following "relevant factors":

(a) The use of paid informants to infiltrate criminal enterprise is a recognized and permissible means of investigation and this proposition remains true "even though the informant or government agent engages in some criminal activity or supplies something of value to the criminal enterprise." The government agent "must be allowed to further the interests of the criminal enterprise in some manner to gain the confidence of the criminal elements with which he must deal."

(b) "The type of criminal activity under investigation is also a relevant consideration regarding the scope of permissible government conduct. For example, the need to use paid informants to infiltrate criminal enterprises is regarded as especially necessary in the investigation of drug-related crimes."

(c) "Another pertinent inquiry is whether the government instigates the criminal activity in

Court of Appeals of New York,[7] in a case decided under the Due Process Clause of the New York Constitution, have listed some relevant factors.

Although the defense of outrageous government conduct is raised most frequently in drug-related cases, it has been asserted in cases involving other offenses. They include *United States v. Bowling,* 666 F.2d 1052 (6th Cir.1981); *United States v. McQuin,* 612 F.2d 1193 (9th Cir.1980); *United States v. Brown,* 635 F.2d 1207 (6th Cir.1980); *People v. Isaacson,* 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (N.Y. 1978), mentioned in footnote 7; and *State v. Pooler,* 255 N.W.2d 328 (Iowa 1977).

In *Bowling* defendant was convicted of interstate transportation of stolen property. Defendant burglarized a home, stole some silver and sold it to an undercover FBI agent. A government informant, Robert Miller, was cooperating with the agent in exchange for lenient treatment. Miller entered the home with defendant and assisted defendant in its burglary. Miller's behavior and the government's use of his cooperation were ruled not to be so outrageous as to bar the conviction. Miller did not organize the burglary, said the court, and did not recruit the defendant to burglarize the home. Miller "merely acquiesced" in the criminal enterprise.

In *Brown* defendant was convicted of receiving stolen goods. Robert Miller, the same FBI paid informant involved in *Bowling,* infiltrated a burglary ring. Miller participated in 40 burglaries. Miller's conduct was held not to be outrageous. The court said that the burglary ring was fully operative when Miller joined it; that Miller's participation was limited to following the instructions of the other burglars; "that, in its use of Miller, the government in no way increased the number of burglaries or the likelihood of their success"; that Miller reported to the FBI on a daily basis; that Miller revealed the location of the burglaries and sometimes provided an inventory of the things taken, thus facilitating the recovery of stolen items.

In *McQuin* two defendants were convicted of "conspiracy to rob a bank" and "attempted bank robbery." The defendants, wearing masks and armed, were arrested when they approached the bank with the admitted intention to commit robbery. The alleged outrageous conduct was attributed to one Canale, an FBI informant, and one Taulbee, a government agent. The offense

---

question, or whether it infiltrates a pre-existing criminal enterprise."

(d) "A related consideration is whether the government directs or controls the activities of the criminal enterprise or whether it merely acquiesces in its criminality."

(e) "We also note that the strength of the connection, or causal relationship, between the challenged government conduct and the commission of the acts for which the defendant stands convicted is an important consideration. We agree with the Tenth Circuit that 'the more immediate the impact of the government's conduct upon a particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety.' "

**7.** In *People v. Isaacson,* 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (N.Y.1978), the court listed the following relevant factors:

(a) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity;

(b) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice;

(c) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness;

(d) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace.

The court also said:

"No one of these submitted factors is in itself determinative but each should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness. As a bare minimum, there should be a purposeful eschewal of illegality or egregious foul play. A prosecution conceived in or nurtured by such conduct, as exemplified in these guidelines, so as to cast aside and mock 'that fundamental fairness essential to the very concept of justice' should be forbidden under traditional due process principles."

took place on December 20. The defendant McQuin testified that on December 19 he had decided not to go through with the robbery but on that date Canale told him that Taulbee would kill him if he did not do so. Canale's action was held not to be "outrageous misconduct." With regard to the conduct of Taulbee, McQuin testified that Taulbee stood in front of him with a drawn gun and that he went along only because he was intimidated. McQuin's version was contradicted by the testimony of Taulbee and the court said that McQuin "suffers here from an inability even to establish that the conduct that he claims was outrageous even occurred."

In *Isaacson,* one Breniman became a police informant as a result of police brutalization. At the behest of the police, Breniman contacted the defendant, a Pennsylvania resident with no prior record, who, although initially unwilling and after persistent solicitation, agreed to sell Breniman drugs and he was lured into New York State to do so. The court found the government's conduct to be outrageous and reversed the conviction on due process grounds. No entrapment was shown because there was proof of defendant's predisposition.

In *Pooler* defendant was convicted of burglarizing a home. The defendant claimed that he was denied due process because of the involvement of police officer Zarifis in the burglary. Zarifis was working undercover. The burglary was jointly committed by Zarifis and the defendant. The court held that the police participation was not so outrageous as to require acquittal. The court said:

"[W]e find the police participation in the burglary outrageous and reprehensible. However, we do not find it constituted entrapment as a matter of law nor do we find it so outrageous and reprehensible that a defendant whose rights were not infringed should be acquitted because of it."

In *Pooler* and *Bowling* the defendant himself participated in the illegal entry and in *Bowling* the offense on trial was not the burglary. The case at bar is distinguishable from those cases. If the conduct of Bressie, Yarberry and Officer Roberts, each acting as a salaried agent of the police department, is subtracted from the Brandhorst break-in, what remains of that midnight enterprise is a lone figure, sitting in a parking lot ½ block away. It is true that defendant had criminal intent but his conduct, standing alone, represented no more of a threat to society than that of a stargazer, similarly situated, contemplating Polaris. It is difficult to conceive a situation where the government's involvement could be greater or the defendant's could be less, and the conduct of the latter still be a likely subject for prosecution.

The break-in was accomplished by the government agents, whether or not defendant was in the vicinity. If the government agents had not been there, doing their illegal acts, defendant's conduct would not be illegal. There was no showing that the Brandhorst break-in was part of ongoing criminal activities engaged in by defendant prior to his involvement with Officer Roberts and the two salaried felons.

■ This court holds that the government action in sponsoring the acts of Bressie, Yarberry and Roberts, with respect to the Brandhorst break-in, was outrageous and that due process bars the state from invoking judicial processes to obtain the conviction of defendant for burglary of the Brandhorst building. Defendant's first point is well taken and that portion of the judgment finding defendant guilty under Count I of the information is reversed.[8]

Defendant's second point attacks the validity of the conspiracy conviction "because the evidence is insufficient to support said

---

8. This ruling makes it unnecessary to consider two additional attacks made by the defendant upon the burglary conviction. Those attacks are: (a) the burglary conviction and the conspiracy conviction may not, under the facts here, co-exist; (b) the evidence is insufficient to support the burglary conviction for the reason "that principals (Bressie, Yarberry and Roberts) who purportedly committed the offense were agents or law enforcement officers who lacked the necessary criminal intent."

conviction in that defendant's alleged co-conspirators were all law enforcement officers or their agents who lacked the required criminal intent."

Count II of the information, on which the conspiracy conviction was based, charged that defendant, on or about August 1, 1980, "with the purpose of promoting and facilitating the offense of burglary in the second degree, agreed with [Bressie, Yarberry and Roberts] that they would commit the burglary of the house located at 732 West Kerr, Springfield, Missouri, and that in furtherance of the conspiracy [defendant] provided information concerning the layout of the house located at 732 West Kerr, drew a map of layout of the above-mentioned house and where the safe was located inside said house, provided the telephone number at said house, and traveled to said house location with [Bressie, Yarberry and Roberts] and indicated the house." Count II also charged the defendant with being a persistent offender.

It will be observed that the target of the burglary, which was the subject of the alleged conspiracy, was not the Brandhorst building but was a residence located at 732 West Kerr. The state's evidence showed that defendant gave his companions a map of the house, including the location of a safe therein. The four men rode to the house in a car driven by defendant, and defendant pointed the house out to the others. Because a vehicle was parked in the yard, indicating the house was occupied, the men returned to the undercover house. Defendant then gave the telephone number of the house to Yarberry. Yarberry, at defendant's request, telephoned the number and the phone was answered, indicating the house was still occupied. No burglary was accomplished nor were further acts committed in pursuance of the scheme.

Defendant does not challenge the sufficiency of the evidence to supply the "overt" act requirement of § 564.016, par. 4.

Defendant argues that Bressie, Yarberry and Roberts lacked criminal intent to burglarize the house. Defendant says that there can be no conspiracy unless at least two persons agree in the purpose to pursue the unlawful enterprise and if one of the two only feigns acquiescence in the proposal of the other, without criminal intent, there is no such agreement and no conspiracy. Defendant relies on outstate cases.[9] Defendant also argues that where one of two persons who conspire to do an illegal act is an officer discharging his duties, the other person cannot be convicted on a charge of conspiracy. In support of that argument defendant cites outstate and federal authorities.[10] Defendant's position is that his three companions were all agents of the government and thus their activities come within the foregoing principles.

The state argues that the cited authorities are not controlling because of the wording of § 564.016, par. 1, defining "conspiracy," which reads: *"A person* is guilty of conspiracy with another person or persons to commit an offense if, with the purpose of promoting or facilitating its commission *he agrees* with such other person or persons that they or one or more of them will engage in conduct which constitutes such offense." (Emphasis added.)

It will be observed that the statute does not open with the language "two or more persons,"[11] but rather it defines conduct which makes *"a person"* guilty of conspiracy. Note also that the statute is in the singular when it uses the language *"he agrees ..."* Thus the statute focuses upon the conduct of one person. The "agreeing"

---

**9.** Defendant cites *Delaney v. State,* 164 Tenn. 432, 11 Smith 432, 51 S.W.2d 485 (1932); *Odneal v. State,* 117 Tex.Cr.R. 97, 34 S.W.2d 595 (1931); see also, generally, 15A C.J.S. Conspiracy § 37, p. 731.

**10.** Defendant cites *King v. State,* 104 So.2d 730 (Fla.1957); *Moore v. State,* 290 So.2d 603 (Miss.1974); *U.S. v. Barnes,* 604 F.2d 121 (2nd Cir.1979); *U.S. v. Moss,* 591 F.2d 428 (8th Cir.

1979); *Sears v. U.S.,* 343 F.2d 139 (5th Cir. 1965).

**11.** Sec. 556.120 RSMo 1969 (repealed effective 1–1–79) provided that "[i]f two or more persons shall agree, conspire, combine or confederate" to commit certain acts, a conspiracy existed.

done by that one person must involve another person or persons but it is sufficient that "he" alone agrees, and it is also sufficient that *he* does so "with the purpose of promoting or facilitating its commission...." It is the purpose of the individual rather than the purpose or purposes of the pair or group of persons which is required under the statute.

■ Applying the statute to the conduct of the defendant here, it may be said that defendant is guilty of conspiracy with the other three persons to commit the burglary of the house at 732 West Kerr because defendant, with the purpose of promoting or facilitating that burglary, agreed with the other three men that they or one or more of them would burglarize the house. Such was defendant's agreement and the fact that the other three lacked, if so they did, the criminal intent to burglarize the house is of no moment.

The foregoing analysis of the statute is consistent with "Comment to 1973 Proposed Code" appearing in 40 V.A.M.S. 426 immediately following § 564.016. That comment, in pertinent part, reads:

"The section also follows the approach of the Model Penal Code and other revisions and proposals by departing from the traditional view that conspiracy is an entirely bilateral or multilateral problem, and instead focuses on each individual's culpability. The conduct of the individual becomes determinative rather than the conduct of a group. Under this formulation, one conspirator cannot escape liability because the only other one was irresponsible or has immunity from prosecution or *secretly does not intend to go through with the plan,* or has been found innocent of conspiracy." (Emphasis added.)

Defendant's second point has no merit.

Defendant's final point challenges the propriety of portions of the prosecutor's cross-examination of defendant. This court has reviewed the record and the authorities germane to this point. No prejudicial error was committed and no precedential purpose would be served by discussing the meritless point.

That portion of the judgment finding defendant guilty under Count I of the information, and sentencing him thereon, is reversed; and all other respects the judgment is affirmed.

GREENE, C.J., and TITUS, J., concur.

GREENE, Chief Judge, concurring.

I concur in all respects with the principal opinion, but wish to add the following comment.

In my opinion, police conduct in connection with the Brandhorst break-in was illegal, outrageous, and in violation of the doctrine of fundamental fairness mandated by the due process clause of the Fifth Amendment to the Constitution of the United States.

What we have here is a police officer committing a crime (burglary, or at least criminal trespass), as was admitted by the assistant attorney general who argued the case before us, on behalf of the state, aided and abetted by two habitual criminals whom the police were paying to help commit the crime, in hopes of getting evidence to show that the defendant, by acting as a supposed lookout, was also guilty of the crime. If such conduct was approved by the courts, it is difficult to imagine under what circumstances they would ever say to the police, "You have gone too far."

Police action, as was taken here, breeds disrespect for law enforcement officers, erodes public confidence in our system of justice, and, if condoned, could lead to police excesses that cannot be tolerated in a democracy. Most excesses in police conduct are, no doubt, motivated by frustration over the inability of the police to completely satisfy the demands of the public to "get the criminals off the streets", but that inability, when it occurs, does not justify breaking the law by those who are sworn to uphold it.

Hopefully, our decision in this case will result in guidelines being formulated by the police department in question, limiting police conduct to such activities as are approved by law.